MAPES CASINO, INC., a Nevada corporation, Plaintiff,

v.

MARYLAND CASUALTY COMPANY, a Maryland corporation, Defendant and Third-Party Plaintiff,

v.

Buster COLLINS et al., Third-Party Defendants.

Civ. No. 1907–N.

United States District Court D. Nevada.

Sept. 6, 1968.

Richard W. Blakey, of Woodburn, Forman, Wedge, Blakey, Folsom & Hug, Reno, Nev., for defendant Maryland Casualty Co.

## OPINION

THOMPSON, District Judge.

This is a suit on two fidelity bonds brought by Mapes Casino, Inc., a Nevada corporation, against Maryland Casualty Company, a Maryland corporation. Jurisdiction is based on diversity of citizenship and the jurisdictional amount. 28 U.S.C. § 1332.

The first policy, effective January 1, 1960 and in effect until July 1, 1965, was a comprehensive Dishonesty, Disappearance and Destruction Policy insuring against "Loss of Money, Securities and other property which the insured shall sustain, to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this insuring Agreement 1, through any fraudulent or dishonest act or acts committed by any of the employees, acting alone or in collusion with others." Under the Table of Limits of Liability is the item: "Insuring Agreement I, Employee Dishonesty Coverage—Form A, $10,000." Other provisions of the policy pertinent to this controversy are quoted in the footnote.[1]

John C. Bartlett, of Vargas, Bartlett & Dixon, Reno, Nev., for plaintiff.

1. "2. Exclusions. This Policy does not apply: * * *

"(b) under Insuring Agreement 1, to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money, securities or other property which the Insured can prove, through evidence wholly apart from such computation, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees;"

"4. Loss Caused by Unidentifiable Employees. If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Insured shall be unable to designate the specific Employee or Employees causing such loss, the insured shall nevertheless have the benefit of Insuring Agreement 1, subject to the provisions of Section 2(b) of this Policy, provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided, further, that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement 1."

"8. Loss-Notice-Proof-Action Against Company. Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and, except under Insuring Agreements I and V, also to the police if the loss is due to a violation of law; (b) file detailed proof

Effective July 1, 1965, a Blanket Crime Policy was substituted for the 3–D policy. It insured against "Loss of Money, Securities and other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others." It provided: "Total Limit of Liability, $100,000." The Blanket Crime Policy contains the same provisions as the 3–D policy regarding the use of inventory or profit computations to prove loss; the coverage of loss by unidentifiable employees; and the requirements of notice and proof of loss. The Blanket Crime Policy, apparently through inadvertence of the insurer, has no endorsement excluding from coverage corporate officers, dealers and shills. It does, however, include the following standard clause which affects the limits of liability under the preceding 3–D policy:

"12. Limit of Liability Under This Policy and Prior Insurance. With respect to loss caused by any person (whether one of the Employees or not) or in which such person is concerned or implicated or which is chargeable to any Employee as provided in Section 4 and which occurs partly during the Policy Period and partly during the period of other bonds or policies issued by the Company to the Insured or to any predecessor in interest of the Insured and terminated or canceled or al-

of loss, duly sworn to, with the Company within four months after the discovery of loss."

Endorsement 28:

"It is agreed that:

"1. With respect to Insuring Agreement 1, "Employee", as defined in Section 3 does not mean any of the following:

CORPORATE OFFICERS
DEALERS
SHILLS"

Endorsement 66:

"It is agreed that:

"1. Excess indemnity, in accordance with the terms of Insuring Agreement 1, is granted by this endorsement on the Employees performing the duties of the following positions, to the amount set opposite the names of such positions, respectively. The amount of such excess indemnity shall apply only to so much of any loss sustained through acts or defaults committed after such excess indemnity becomes effective as is in excess of the amount recoverable or recovered on account of such loss under insuring Agreement 1.

"2. The liability of the Company under this endorsement on account of any one Employee in any one or more of such positions (in the original or an increased or decreased amount) shall not exceed the largest single amount of indemnity on any one position occupied by such Employee.

"3. No excess loss shall be recoverable under Insuring Agreement 1 as amended by this endorsement unless caused by an Employee who has been identified as having caused such loss, anything to the contrary in Insuring Agreement 1, or this endorsement notwithstanding.

| Positions | Location | Total Number of Employees in Each Position | Amount of Excess Indemnity on Each Employee |
|---|---|---|---|
| Head Cashier | Reno, Nevada | 1 | $40,000.00 |
| Auditor | Reno, Nevada | 1 | 90,000.00 |
| Ass't Auditor | Reno, Nevada | 1 | 40,000.00 |
| Payroll Clerk | Reno, Nevada | 1 | 40,000.00 |
| Mgr. | Reno, Nevada | 1 | 40,000.00 |
| Night Auditor | Reno, Nevada | 1 | 15,000.00 |
| Manager (Casino) | Reno, Nevada | 1 | 90,000.00 |
| Cashiers (Casino) | Reno, Nevada | 8 | 30,000.00 |
| Head Floorman (Casino) | Reno, Nevada | 4 | 40,000.00 |
| Manager (Airport) | Reno, Nevada | 1 | 40,000.00 |

lowed to expire and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Company under this Policy and under such other bonds or policies shall not exceed, in the aggregate, the amount carried under this Policy on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss, if the latter amount be the larger."

Mapes Casino, Inc. is engaged in the licensed gaming and casino business in Reno, Nevada. Its principal table games are craps (dice), twenty-one and roulette. Chips are sold for cash or credit to players for their use at the games. Other casinos, such as Harrah's Club, Harolds Club, Primadonna, Horseshoe and Palace Club, operate in the same way and the chips sold by each club in one dollar, five dollar and twenty-five dollar denominations circulate freely as money in the other clubs and will be exchanged for money in the other clubs.

The skeleton crew of a gaming casino consists of the manager, the cashier, pit bosses who supervise the games, and the dealers. Each twenty-one game has a dealer and a roulette wheel is operated by a dealer or croupier, sometimes with an assistant check racker, but a large crap table, in addition to two dealers or stickmen, is usually regulated by a boxman who sits between the stickmen and supervises the bets, collections and payoffs. The boxman, when relieved for rest periods, is replaced by a pit boss, not a dealer, and his duties are more nearly aligned with supervision and management than with dealing.

In August, 1965, the management of the Mapes Casino received a report from a cashier of another casino that unusually large amounts of Mapes chips were being cashed in. The assistant manager requested other casinos to watch for similar occurrences and received like reports. Toward the end of August, one Buster Collins was identified by the Cashier of the Primadonna Club as the person who had cashed in an unusual quantity of Mapes chips. Collins was interrogated by the police and officials of Mapes Casino and admitted cashing in chips at other casinos for unnamed Mapes employees for a period of from eighteen to twenty months. A few days later, Collins conferred with Mr. Glen Thorne and Mr. Charles Mapes and named certain employees who were involved in filching chips, all connected with the crap game and including five who had been employed at times as boxmen. Thereafter certain of Mapes Casino employees were fired.

Collins' story, reaffirmed in his testimony in Court, was that over a period of eighteen to twenty months preceding August, 1965, he received telephone calls (sometimes relayed through his wife) that a quantity of Mapes Casino chips would be found in a certain automobile parked at a certain place. He would go to the automobile, obtain the chips, cash them at another casino and place the money received in the automobile, receiving varying amounts for his services. About June 1, 1965, he received $1,650 in casino chips (approximately two-thirds Mapes chips) from one Matt Mathenia at a local motel and cashed them. About three weeks later, he got $650 in chips from the same man at the same place. Mathenia was a crap dealer employed from June 9, 1964 to May 21, 1965, and from July 8, 1965 to September 1, 1965. Twice in August, 1965, Collins received a telephone call from a voice that sounded like "Rich" telling him to go to a blue Corvair. On one occasion, there were $1,300 in chips and on the other occasion there were $1,200 in chips. Other testimony justifies an inference that "Rich" was one Richard Jonaitis employed as a dealer and boxman at the Mapes. Collins also testified that with the exception of the four large "cashouts" just mentioned, the amounts of chips he picked up from automobiles ranged from $150 to $350 during a period of eighteen to twenty months as often as twice a week with sometimes a three-month interval between transactions. He

estimated he had handled a total of about $15,000 in stolen chips. Collins' activities in cashing unusual amounts of Mapes chips during May, June, July and August of 1965 were corroborated by the testimony of cashiers of other casinos.

Collins was not the only pick-up man involved. William M. Nash, now employed by Mapes, was a lookout detective in Harolds Club between November, 1963 and August, 1965. During a six-months period while he was on the graveyard shift, he observed a man, not Buster Collins, cash in $200 to $400 in Mapes casino chips at Harolds Club cashier's cage three or four times a week. Further, Jerelin Smith, a cashier for Harrah's Club, testified that she had not only cashed in unusual quantities of Mapes chips for Buster Collins, but also that on two occasions, she remembered she had cashed in Mapes chips for a very nervous woman in amounts in excess of $600.

At the time of Collins' confession, one Frank A. Almquist was an adjuster for Maryland Casualty Company stationed at Reno. In September, 1965, he was orally notified by Mapes about the Collins situation and the possibility of a large claim against the bonds, and this information was relayed to the San Francisco office of the company. Some months passed while the Mapes officials were attempting to compute the loss and fix the responsibility. Finally, on February 8, 1966, Almquist wrote a letter to one Frank Hassett, an adjuster Mapes had hired, as follows: "Pursuant to our conversation, in regard to the possible large money loss at the Mapes Hotel, we are attaching a proof of loss form for completion." On February 10, 1966, the insured executed and delivered a "Proof of Loss" which read, in part: "[P]resent claim for loss resulting from default of various employees in the Mapes Casino. Said employees have been in the employ of said Employer for varying periods from November 1963 to August 1965, the employment having been discontinued by reason of our discovering the shortages of money in the total amount of $431,024.00." On February 28, 1966, Almquist acknowledged receipt and stated: "Would you please forward the names of the employees in question." On the same date, Almquist wrote a report to the home office which shows that he was familiar with the basis for the claim and includes the statement: "This insured, via Mr. Hassett, stated to me that he had ten names, but he did not wish to disclose them at this time. I do not know what positions they held." On March 14, 1966, the manager of the San Francisco Claim Division of defendant wrote to Almquist regarding the claim.[2] Defendant company obtained a copy of the police report and hired an investigator who made a report on April 15, 1966 which included a summary of an interview with Buster Collins.

On March 17, 1966, officials of defendant company from San Francisco met with Mr. Mapes and Mr. Hassett. Defendant was interested in obtaining ap-

---

2. "We should make as complete an investigation as possible before we decide whether or not to deny liability in this case.

"You only have one opportunity to do this and that is before a denial of liability. You should insist on insured giving us all of the information they have, which would include the names and addresses of all of those known to have taken money or property, as well as to have them give us something more than we have at the present time, which appears to be merely an estimate of what they think they have lost.

"Do not overlook the possibility of reviewing the police records.

"One of the problems here is caused by the fact that the first policy is in the penalty of $10,000.00 and the second one at a penalty of $100,000.00. Unless the entire loss is confined to the second policy, effective July 1, 1965, there could not be any more than $10,000.00 under the previous policy without going into proof that those mentioned under the excess coverage were responsible for the loss.

"This may be the only opportunity you will have to find out if they have any information before the door is closed on this subject."

proval of an endorsement to the Blanket Crime Policy to exclude coverage of officers, dealers and shills, an endorsement claimed to have been omitted by mistake. Mapes refused. The proof of loss was discussed, defendant seeking the names of the defalcating employees asserted to be responsible for the loss. Mapes refused to charge specific employees with the loss unless he could be assured of indemnification against possible liability for defamation.

On May 10, 1966, Almquist wrote Mapes: "Your proof of loss dated February 10, 1966 in the amount of $431,024.00 has been reviewed and it fails to prove a loss. There is no evidence of a loss. For these reasons and other valid reasons, we must respectfully deny your claim."

This action was commenced on December 30, 1966.

## REJECTION OF HEARSAY

The record in this case is full of hearsay testimony, some received over the objection of defendant. At the outset of the examination of Buster Collins, plaintiff asked him to testify to what he had told others, i. e., the police officials and Mapes officials, apparently believing that these statements qualified as declarations against interest, an exception to the hearsay rule. The Court entered the lists and announced that it would reject the orthodox rule that prior inconsistent statements of a witness are admissible only as affecting his credibility but not for the truth of the matter then stated and would go along with Professor Edmund M. Morgan's exposition of the absurdity of such a rule. (See, for example, the American Law Institute, Model Code of Evidence.) This statement served only to confuse counsel and to further complicate the record. The difficulty has been resolved, however, by the subsequent express disavowal by counsel for plaintiff of an intention to rely upon any hearsay testimony to prove his case. Accordingly, the Court has disregarded and has treated as stricken from the record testimony of that character, including, for example, the testimony of Officer Andrini, Officer Poole, Mr. Mapes and Mr. Thorne regarding what Collins had told them and their identification of employees allegedly involved in stealing chips. This leaves us with only four employees identified by competent evidence—Matt Mathenia, a crap dealer; Richard Jonaitis, a crap dealer and boxman, identified by Collins; Eddie Moss, a pit boss; and Bob Pratt, a crap dealer, identified by Bud Van Hatton. Moss was employed as a pit boss from July 3, 1962 until March 31, 1964, and Pratt was employed as a dealer from November 23, 1963 until September 13, 1965.

## PROOF OF LOSS WAS TIMELY AND ADEQUATE UNDER THE CIRCUMSTANCES

Defendant argues that the proof of loss was not filed within four months after discovery of the loss; that is, that the formal claim filed in February, 1966 was not within four months of the apprehension of Collins in August, 1965. It is true that in August, plaintiff discovered evidence of a loss indemnified by the bonds, but not the full extent thereof. Defendant was promptly advised of the circumstances. The proof of loss form was supplied by defendant's Agent in February, 1966, a proof of loss was submitted, an investigation was conducted, and in May, 1966, the claim was rejected, not on the ground that it was untimely but on the grounds that "it fails to prove a loss. There is no evidence of a loss." The claims manager of Maryland testified that it was common practice under fidelity bonds to report losses "subject to audit". The bizarre circumstances of this case and the obvious difficulty of pinpointing the loss and the employees responsible therefor (who may have been either covered or excluded employees under the 3–D policy) justify a finding, from the facts we have related, of a waiver of strict compliance with the time limitations of section 8 of the policy (Fn. 1, supra). If an insurer denies liability to an insured on grounds other than those relating to defects in the no-

tice or timeliness of proof of loss, compliance with the requirements as to notice and proof of loss will be deemed waived. Travelers Insurance Co. v. Peerless Insurance Co., 9th Cir. 1961, 287 F.2d 742; Couch on Insurance, 2nd Ed., § 26.305; Gerhauser v. North B. & M. Ins. Co., 7 Nev. 174, 187.

Defendant also asserts that the proof of loss submitted in February, 1966 is too general and undetailed to satisfy the requirements of the policy. We cannot say much for the draftsmanship of the so-called "proof" which, in substance, claimed $431,024 for default of "various employees" from November, 1963 to August, 1965. Most of the period mentioned was under the 3–D policy which excluded dealers, shills and officers from coverage and which provided excess indemnity (Endorsement 66, Fn. 1, supra) for certain employees. Plaintiff's evidence at trial sought to involve certain managerial employees such as the casino manager and head cashier to raise the umbrella of the excess coverage endorsement.

■ We think it reasonable to require under a fidelity bond such as the 3–D policy first issued by Maryland to the insured—a bond which not only excludes certain classes of employees from coverage but provides excess indemnity in varying amounts with respect to other employees—that the proof of loss submitted should identify the employee or employees charged with the responsibility for the loss, that at the very least the proof of loss should put the insurer on notice of a claim within the coverage of the bond. 50 Am.Jur. 1142, Suretyship, § 361. Counsel have cited no authority and we have found none which poses the fear of a suit for defamation as a justification for non-compliance with the proof of loss requirements of a fidelity bond.

■ Nevertheless, we cannot ignore the "Loss caused by Unidentifiable Employees" (Fn. 1, supra) coverage of the bonds. The proof of loss submitted was an adequate statement of loss due to unidentifiable employees. Defendant's adjuster was conversant with the facts and circumstances supporting the claim, and the company made no demand for additional information other than the names of the defaulting employees. The statement in the rejection letter, "There is no evidence of a loss", was patently incorrect and was known by the responsible officials of defendant company to be incorrect. There was then clear and acceptable proof that a substantial loss had been suffered due to employee dishonesty. The difficulty which both the insured and insurer faced was in establishing how the loss occurred and the extent thereof. Treating this as a proof of loss due to defalcations by unidentifiable employees under the coverage of the bonds, the insured furnished all information it could reasonably be expected to supply under these unusual circumstances, and the proof of loss, as so supplemented, is adequate to invoke the protection of the bonds. This is the kind of claim which would have to be settled by arbitration or litigation unless the parties should buy their peace by picking a settlement figure out of the air. Under the circumstances, the rejection of the claim by defendant company was automatic.

## COMPUTATION OF THE LOSS

After disclosure of Collins' activities, Mapes Casino reexamined its records and determined that the percentage of win for the crap tables between November, 1963 and August, 1965 was much lower than it should have been by mathematical calculation. In casino parlance, the percentage of win to drop is the "per." A shift of a crap table, or other game, starts with a certain money value of chips in the bank. As the game progresses money received from the players is dropped in the box, as are chips of other casinos. As the game progresses, the bank may become depleted and a fill of chips is brought from the cashier's cage; the amount is recorded on a fill slip which is also dropped in the box; and credit slips are dropped representing excess chips taken from the table. At the conclusion of the shift, the percentage which the game won or lost may be cal-

culated by comparing the starting bank with the ending bank and the drop. The figure of $431,024 claimed by Mapes in its proof of loss was arrived at by calculation. The total drop for the crap games from November, 1963 through August, 1965 (twenty-two months) was $3,162,797. Assuming a normal win percentage of twenty per cent, Mapes believes its crap games won $632,559 during this period. The books show a total win of $201,535, or 6.37% of the drop. The difference of $431,024 is the amount claimed due to filching of chips by employees. As defendant points out, this represents 86,200 five dollar chips.

Mapes' records show that the twenty-one and roulette games held the normal percentage during this twenty-two month period and that the only bad experience was with the crap game.

■ Defendant objected to this evidence as falling within exclusion 2(b) of the bonds (Fn. 1, supra) "a loss the proof of which either as to its factual existence or as to its amount is dependent upon a * * * profit and loss computation." In our view of the evidence, we need not discuss the ramifications of this exclusionary clause and the varying applications of it in the cases. See: "Claims for Inventory Shortage Resulting from Employee Dishonesty Under Fidelity Insurance Bonds—a Present Appraisal", Vol. XXXIII, Insurance Counsel Journal, No. 3, July, 1966, p. 397; Meyer Jewelry Company v. General Insurance Company of America, 1968 Mo., 422 S.W.2d 617; Gillette Company v. Travelers Indemnity Company, 7th Cir. 1966, 365 F.2d 7. The preponderance of the evidence shows that while computation of the percentage of win from a game and calculation of an unusually low percentage of win are reliable indicia for the guidance of management and a probable indication that something may be wrong, they are not reliable proof of loss due to employee dishonesty. There are too many variables. A bad "per" on the books may be due to skimming (taking off the top before counting the drop), scamming (cheating by collusion between dealer and player), crossroading (professional cheaters among the players), bad fills, false fills, spotty play, the odds given by the house, and just plain bad luck. Reliable testimony indicates that each casino tends to establish its own normal percentages, and that they vary from house to house.

■ While the statistical evidence of the gaming experience at the Mapes Casino is unpersuasive in proving the amount of employee defalcation, it is probative and pertinent evidence in other respects. Over a period of several years, the house percentage for craps at the Mapes has averaged approximately 18%. During the twenty-two month period in question, the percentage of win was 6.37%. This is evidence that something was wrong, and employee dishonesty is one possibility. We consider the evidence to be probative in the following particulars:

1. It identifies the crap table as the locus of the problem.

2. It corroborates Collins' testimony of the period of time involved in the filching of chips by employees.

3. It is corroborative of other evidence that the losses due to employees were substantial and that Collins was probably not the only outside man, or woman, who was used to exchange the Mapes chips for money at other casinos.

### LIMITS OF LIABILITY

Under the 3–D policy, with its unidentified employee coverage, the first problem we face is the endorsement excluding coverage for officers of the company, dealers and shills (shills are persons hired to play at the games to keep them going when patrons are few). These employees were not excepted from coverage under the Blanket Crime Policy effective after July 1, 1965.

■ The 3–D policy covers losses sustained through fraudulent or dishonest act or acts committed by employees "*acting alone or in collusion with others.*" If the evidence has shown that the crap dealers could have stolen the chips acting alone, there would be no coverage. But

the evidence is to the contrary. The preponderance of the evidence warrants the finding that no crap dealer could have filched any substantial quantity of chips without the connivance of the boxman, and, in all probability, the pit bosses. Some witnesses suggested that the entire personnel of the casino would have to be involved. In any event, it is clear that unidentified employees who were within the coverage of the policy colluded in the defalcations.

■ Because the defaulting employees cannot be identified, the excess coverage (Endorsement 66) of the 3–D policy does not come into play. We are saved the difficulty of determining whether the aggregate limit of liability in these circumstances under the 3–D policy is $10,000 by paragraph 12 of the superseding Blanket Crime Policy (see p. 4 supra) which increases the limits of liability under the 3–D policy to $100,000. This is not only the plain import of paragraph 12, but defendant Maryland Casualty Company concedes the effect as stated. Accordingly, unless the evidence proves an aggregate loss in excess of $100,000, there is no need, and certainly no desire, further to investigate the intricacies of the coverage limitations of these policies.

## DAMAGES

■ The extent of the damages suffered by Mapes Casino as a result of employee dishonesty covered by the fidelity bonds is not a matter of exact mathematical calculation. The law does not require that it be so exactly proved. In this diversity action, Nevada law applies, and the Nevada Supreme Court acknowledges the general rule that the preclusion of recovery of uncertain damages is directed against uncertainty as to the existence or cause of damage rather than as to measure or extent. Brown v. Lindsay, 68 Nev. 196, 228 P.2d 262; Casey v. Musgrave, 72 Nev. 31, 292 P.2d 1066. In the *Brown* case, the Court said:

"There were periodic shortages; loss in production and efficiency was very definite; there was a definite delay and loss of time due to insufficient logs. This was not the result of speculation or conjecture; this was not guesswork.

"The uncertainty in the testimony applies not to the existence or cause of damage but rather to its extent or measure. Even here the uncertainty is not speculative or conjectural in character. The testimony as to the extent of damage is not based upon inference or assumption as to what may have occurred but upon recollection as to what actually did occur. In the view of this court, the extent to which that recollection was uncertain in detail will not serve to render it wholly insufficient. Accordingly there was evidence to support the finding and judgment of the lower court in this respect, and upon that item of damages the judgment is sustained."

■ The computation of damages is based upon the testimony of witnesses and not upon the records of the Mapes Casino. Collins testified to four large "cash-outs" in June, July and August, 1965, of $1,650, $650, $1,300, and $1,200, a total of $4,800. The testimony that part of the chips were from other casinos is not corroborated by any casino cashier and is discredited.

Collins testified that he operated from eighteen to twenty months in this activity and cashed in from $150 to $350, irregularly, sometimes twice a week, in chips. The cashiers of other casinos recalled occasions when Collins cashed in $250—$300 (Harrah's Cashier); $200 (Palace Club); $200—$300 (Palace Club); $150—$200 (Primadonna Club); $300 (Palace Club). We conclude from all the evidence that during a period of eighteen months before July, 1965, and excepting the four big "cash-outs", and taking into consideration some irregularity in the action, Collins cashed an average of $400 a week of Mapes Casino chips stolen by Mapes employees with the collusion of covered employees, totaling approximately $28,800.

The lookout detective of Harolds Club testified that for a period of six months,

he observed a man, not Buster Collins, cash in $200 to $400 of Mapes Casino chips three or four times a week. Inferring an average of $900 per week, the total is approximately $21,600. And the Harrah's Club cashier remembered approximately $1,200 worth cashed in by a very nervous woman during this period.

Accordingly, we conclude from the evidence that the total recoverable loss under the fidelity bonds was $56,400.

This Opinion will suffice as the Court's Findings of Fact and Conclusions of Law, and judgment shall be entered accordingly.