The **ATLANTA COCA-COLA BOTTLING COMPANY**

v.

**TRANSAMERICA INSURANCE COMPANY.**

**Civ. A. No. 15112.**

United States District Court,
N. D. Georgia,
Atlanta Division.
April 17, 1973.

See also, D.C., 61 F.R.D. 115.

Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

This action arises out of an insurance policy issued by defendant to plaintiff. Under the Blanket Crime Policy, plaintiff made a claim for $42,566.76, which amount plaintiff claims was misappropriated from 1964–1969 from certain of plaintiff's drink dispensing machines by two of plaintiff's routemen, who were employed by plaintiff and whose primary function was to replace product in the drink dispensing machines and to collect money therefrom. The claim was denied by defendant and this action ensued. The case has been submitted to the court on defendant's motion for summary judgment and on plaintiff's motion for partial summary judgment. These motions are overlapping to a great extent and the issues raised in

both motions will be dealt with at the same time.

## THE QUESTION OF LOSS DUE TO EMPLOYEE DISHONESTY

In order for plaintiff to recover under the policy it must be shown that plaintiff has suffered a loss and, in addition, that the loss was due to employee dishonesty. Defendant argues that, as a matter of law, plaintiff has failed to show that employee dishonesty was responsible for the loss. Plaintiff on the other hand argues that it has established, as a matter of law, that the loss suffered resulted from thefts of money by its employees Crocker and Gravett.

While most of the facts bearing on this issue are undisputed, the permissible inferences from those facts lead diametrically opposed conclusions. Defendant points out all the possibilities which could result in a decreased yield from the pre-mix machines in question, such as leaking, break-ins, tests, overflow, partially filled tanks, etc., other than the conversion of money from the money boxes of the machines by the routemen servicing those machines.

Plaintiff, on the other hand, seeks to show by its experience in pre-mix machines and by the careful way in which such machines are controlled that it has excluded all other inferences concerning loss from these machines.

It is quite clear to the court that only the jury can resolve the question whether plaintiff has actually suffered a loss due to employee dishonesty.

## THE QUESTION OF THE 2(b) EXCLUSION

Section 2(b) of the section of plaintiff's policy entitled "Exclusions" provides that the policy does not apply:

(b) To loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees.

This clause, often referred to as an inventory exclusion clause, is a standard provision in fidelity insurance contracts. Its purpose is to protect insurers from claims which are based upon inventory records of the insured and thus in most cases less reliable than claims based on other evidence. See York Lumber Co. v. Fidelity & Deposit Co. of Maryland, 331 F.Supp. 1131 (E.D.Penn.1971). While this clause has been much litigated and both parties have cited to the court numerous cases construing this and similar inventory exclusion clauses, the courts of Georgia have apparently never interpreted this provision. Accordingly, this court must make an "Erie guess" as to how the Georgia courts would apply the clause in the context of this case.

Defendant argues that plaintiff's claim is totally barred because the proof of the loss, both as to factual existence and as to amount, depends upon inventory and profit and loss computations. In order to explain the reasons why the court disagrees with defendant's position it is necessary to summarize the nature of plaintiff's pre-mix operations and the type of proof through which plaintiff seeks to prove its loss.

The alleged fidelity losses with which the action is concerned were sustained by the plaintiff on two soft drink vending machine routes serviced by plaintiff at the Lockheed-Georgia facility in Marietta, Georgia. The 175 to 210 vending machines which were maintained by plaintiff at Lockheed were serviced on five routes, three of which were truck routes, i. e., serviced by a routeman driving a truck and two of which were

scooter routes that were serviced by a routeman who drove a "golf cart like" scooter. The scooter routemen serviced the machines in the large main assembly building at Lockheed, while the truck routemen primarily serviced the machines in the outlying buildings.

All of the soft drink vending machines at Lockheed were "pre-mix machines" which held between eight and ten tanks of ready-to-consume soft drink which is commonly referred to as pre-mix. When a customer deposited the correct amount of change into one of these machines, a cup dropped into the dispensing area of the machine and was partially filled with a prescribed amount of ice; the machine then dispensed, directly from one of the pre-mix tanks, a prescribed amount of pre-mix soft drink into the cup.

On any given business day, after a Lockheed routeman (whether a truck or scooter routeman) picked up and loaded his vehicle with a sufficient number of pre-mix tanks to service his route, he would proceed to the first machine to be serviced and park his vehicle adjacent to that machine. After unlocking and opening the machine, the routeman would determine which tanks were empty by observing whether the clear plastic tube carrying the product from the tank contained gas, rather than product; he would then remove tanks which appeared empty.

The routeman replaced the tanks which he had removed with full pre-mix tanks. He then replenished the cups in the machine and collected the money from the machine's coin box by emptying the box into a money bag which contained the receipts from all the machines which he serviced on the route that day.

The routeman filled out a Pre-Mix Full Service Sales Ticket (also commonly known as the "daily sales ticket"), recording his service upon, and placement of tanks of pre-mix product in, that particular machine. On this daily sales ticket, the routeman indicated the

number of the machine serviced, the number of tanks of pre-mix product which had been purchased from the machine and, accordingly, replaced with new tanks, the number of tubes of cups placed in the machine, and, if the routeman had run any tests on the machines or discovered any losses from leakage from tanks or otherwise, should have recorded the amount of such tests and losses.

A routeman normally serviced, in the manner described above, approximately one-half of the machines on his route in one day and serviced the other machines on his route the following working day. He would, however, visit every machine on his route each day to clean and inspect the external areas of the machines. When all the machines had been visited, the routemen returned to the Company's Marietta plant, the truck routemen in their trucks and the scooter routemen in their private automobiles. At the Marietta plant, each routeman utilized the daily sales tickets which he had prepared for the various machines serviced that day in order to prepare a *total* daily sales ticket (on the same daily sales ticket form), which indicated the total number of tanks sold, tests and losses made, and tubes of cups placed that day on his entire route. He then placed the total daily sales ticket and individual machine tickets in the money bag and deposited the bag in a safe.

Early the following morning, the safe was opened and the money was counted on automatic coin counters by plaintiff's clerical personnel in the Marietta office. The money for each route was counted separately, and the total amount received from each route was inserted in the applicable space on the respective total daily sales tickets which the routemen had turned in the night before. When the amount of cash received from all five Lockheed routes had been recorded, these figures were totaled to determine the daily receipts from the Lockheed account, which aggregate

amount was reported to the Company's Atlanta office.

In May, 1969, plaintiff was advised by a telephone call from a "Mrs. Bryant", who has never since been found or identified, that some of the routemen at Lockheed were stealing substantial amounts of money from the plaintiff. Plaintiff then initiated a day-to-day review of the sales tickets turned in by the Lockheed routemen and soon discovered that substantial shortages were being sustained each day on one of the Lockheed scooter routes. Subsequently the daily sales tickets were reviewed for all Lockheed routes going back from the date of the telephone call and it was determined that the two scooter routes at Lockheed had substantial and continuous shortages for the period from late 1964 through May, 1969, while the other three Lockheed routes were all over the expected yield during most of that same time period.

Plaintiff seeks to prove the fact of the loss and its amount largely by use of the daily sales tickets turned in by the routemen. The fact of the fidelity loss must, as discussed above, be proved to the satisfaction of the jury. The question now for decision is whether plaintiff can utilize these daily sales tickets in attempting to convince the jury of the loss and of the amount thereof. Defendant contends that use of the daily sales tickets showing the number of tanks placed in the machines and amount of cash derived therefrom is an inventory computation or a profit and loss computation within the meaning of the inventory exclusion clause. The court does not agree.

The court in Fort Smith Tobacco & Candy Co. v. American Guar. & L. Ins. Co., 208 F.Supp. 244, 254 (W.D.Ark. 1962), approved the following definition:

"An inventory computation is an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold. A computed inventory loss, therefore, would be the difference arrived at by deducting an actual inventory from the inventory computation."

In contrast, plaintiff in the present case seeks to prove the loss by means of the daily sales tickets prepared by the allegedly dishonest routemen themselves on a daily, continuous basis. The daily sales tickets reflect the amount of premix product put into the machines each day and the money collected from the machines. Plaintiff then simply calculated from those tickets the amount of its claimed loss. No reference was made to traditional inventory or profit and loss records.

The Fifth Circuit case of Sun Insurance Co. v. Cullum's Men Shop, Inc., 331 F.2d 988 (5th Cir. 1964), is directly in point in this regard.[1] In that case plaintiff sought to prove the amount of its claim through use of a "swatch book", which showed lot number, manufacturer, color, style, cost and retail price and when possible a swatch of material, of every suit purchased by the plaintiff, a retail clothing store. As a suit was sold plaintiff lined out from the swatch book the entry for that particular suit. The list of missing suits compiled by the plaintiff as its proof of loss was determined by checking the garments on the rack against the suits listed in the swatch book.

The court held that proof of the loss by use of the swatch book was not prohibited by an inventory exclusion clause identical to the one in the instant case. The court distinguished inventory computations from the computation in that case which "consisted of an enumeration of each missing item, suit by suit, based

1. This case arose out of the Southern District of Georgia and thus is the only precedent on the question of what interpre-tation would most likely be given to the inventory exclusion clause by the Georgia courts.

upon a check of the stock record, the swatch book, against the stock actually on hand." Sun Insurance Co. v. Cullum's Men Shop, Inc., *supra*, at 991.

That distinction is present in this case as well. Just as the insured in *Cullum's* made a daily record of the merchandise which it sold over the relevant time period, plaintiff has itemized each tank of pre-mix product placed daily on the Lockheed routes in question and the amount of cash receipts therefrom over the relevant time period. Moreover, as plaintiff points out, the documents sought to be used in this case were prepared contemporaneously by the routemen themselves, not by the company which seeks insurance coverage for the loss, and the documents are accordingly entitled to great weight.

■ Alternatively, the application of the proviso in the inventory exclusion clause presents the granting of defendant's motion for summary judgment. The proviso of the clause reads as follows:

> [P]rovided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees.

In the context of the inventory exclusion clause, the proviso allows the use of inventory-type computations to prove the *amount* of the loss due to employee dishonesty if the insured can prove the *fact* of the loss from employee dishonesty from evidence other than inventory computations. See Tri-Motors Sales, Inc. v. Traveler's Indemnity Co., 19 Wis.2d 99, 119 N.W.2d 327 (1963). The proviso has also been interpreted as meaning that so long as there is other independent evidence of employee dishonesty, the insured may supplement and corroborate that evidence with inventory computa-

tions. *See* Kentuckiana Sales v. Security Ins. Co., 394 S.W.2d 744 (Ky.1965).

In a careful opinion upon which both parties rely, the Appellate Division of the Superior Court of New Jersey held as a matter of public policy and fair accommodation between insurer and insured that inventory computations can be used in a limited way.

> Such accommodation, in our judgment, should preclude recovery by the insureds under this bond if they had no proof whatever of an employee-connected loss other than inventory or profit and loss computations, no matter how reliable in the particular case. On the other hand, inventory records may by their very nature constitute inherently indispensible proof of an allowable claim under a fidelity bond in one or the other or both of two respects: (a) as the only available proof of the full amount of a loss, there being some appreciable proof from other facts or circumstances of a loss caused by employee-dishonesty; (b) as corroboration sufficient to make a case for the fact-finder of the fact of an employee-connected loss where independent proof thereof, considered alone, might be insubstantial. To deny an insured the right to adduce proof of inventory records for either of these purposes might in a particular case defeat justice by precluding recovery on a meritorious claim by use of the only proofs reasonably available to the insured and probative thereof. So to do would contravene public policy, not only in defeating the reasonable expectations of coverage of the purchaser of the insurance but also in allowing a private agreement to nullify the inherently probative effect of relevant evidence. Hoboken Camera Center, Inc. v. Hartford Accident and Indemnity Co., 93 N.J.Super. 484, 226 A.2d 439, 448 (1967).

■ In the present case plaintiff has independent evidence of employee dishonesty. Crocker, one of the routemen

who plaintiff claims is responsible for substantial thefts, has made several conflicting statements, both admitting and denying the thefts. In his deposition taken May 4, 1971, Crocker admitted that he did take money from the machines but was vague as to the exact amount. At one point he testified:

Well, I told you a while ago it averaged about fifty cents a day. I figured maybe $200 maybe the whole time. Maybe it might have run a dollar a week counting; I'm figuring it up now.

Such testimony is sufficient independent evidence to permit plaintiff to seek to prove the full amount of the claimed fidelity loss through inventory computations.

Defendant argues that plaintiff's computations are speculative in that they depend upon plaintiff's receiving a certain estimated yield from every tank of pre-mix product. The speculativeness of the calculations can of course be argued to the jury and taken into account by it in determining whether or not there was a loss due to employee dishonesty and the amount of the fidelity loss, if any; the court simply holds that the method by which plaintiff seeks to prove the loss and the amount thereof is not barred by the inventory exclusion clause.

## STATEMENT OF CROCKER

Crocker, the routeman on the route which showed the most substantial losses, has made several conflicting statements regarding any theft of money from plaintiff. Defendant seeks a ruling from the court at this time that a statement which Crocker gave the plaintiff is not competent evidence. This question will be ruled upon at the time of trial if and when plaintiff seeks to introduce the statement into evidence.

## THE DEFENSES OF FRAUD AND ESTOPPEL

Plaintiff seeks a summary ruling from the court striking the defenses of estoppel and fraud. As defendant has not responded to this aspect of plaintiff's motion and has nowhere in its lengthy briefs referred to these defenses, the motion to strike is granted.

## BAD FAITH BY DEFENDANT

Plaintiff has alleged that defendant acted in bad faith in denying plaintiff's claim. Defendant seeks summary judgment on this issue, contending that the refusal to honor the claim was based on a reasonable ground, that is, defendant's interpretation of a doubtful question of law. However, as the court noted in its order of November 9, 1972, where an insurer denies the claim of its insured upon inadequate evidence or upon only a perfunctory investigation, the jury may properly infer that such refusal to pay was made in bad faith. *See* Reserve Life Ins. Co. v. Ayers, 217 Ga. 206, 212–214, 121 S.E.2d 649 (1961); Independent Life & Accident Ins. Co. v. Hopkins, 80 Ga.App. 348, 56 S.E.2d 177 (1949). As plaintiff points to certain facts as support for its claim that defendant did not make an adequate investigation of the claim, defendant's motion for summary judgment on this issue must be denied. Defendant is not precluded, of course, from seeking a directed verdict on this issue at the close of plaintiff's case.

In sum, the court has today denied defendant's motion for summary judgment, granted plaintiff's motion to strike the defenses of fraud and estoppel and granted in part plaintiff's motion for partial summary judgment.

It is so ordered.