[No. 24348-9-I. Division One. July 23, 1990.]

HANSON PLC, ET AL, *Respondents,* v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., *Appellant.*

562

*John F. Kruger, Richard B. Shattuck,* and *Karr Tuttle Campbell,* for appellant.

*Edward M. Archibald, Nicholas Wagner,* and *Bogle & Gates,* for respondents.

SCHOLFIELD, J.—The insurer, National Union Fire Insurance Company (National Union) appeals from a judgment on a verdict for the insured, Hygrade Food Products Corporation (Hygrade)[1] in Hygrade's action for payment of benefits under a fidelity insurance policy. Hygrade cross–appeals from the trial court's denial of prejudgment interest. We affirm.

## FACTS

Hygrade, a national meat processing company, operated its own rendering department in which it processed meat byproducts into tallow and meat meal. Hygrade also rendered byproducts that it purchased from suppliers. One of those suppliers was a company called Recycling Services (Recycling). Recycling was based in both Yakima, Washington (Recycling–Yakima) and Portland, Oregon (Recycling–Portland). Hygrade received materials from both locations until late 1981, when the Yakima deliveries were terminated.

---

[1]On February 3, 1989, just over a year after the entry of judgment in the trial court, Hygrade assigned this cause of action to its sole shareholders, Hanson PLC and Marnee, Ltd., who thereby, with the court's permission, became the respondents. To avoid confusion, the respondents will be referred to here collectively as Hygrade.

Hygrade paid Recycling on the basis of the amount of tallow and meat meal rendered from the raw materials that Recycling delivered, less a processing fee based on the quantity of raw materials. Hygrade paid the published market price per pound for the tallow and the meat meal. Thus, it was the finished products, the tallow and meat meal, that Hygrade was buying from Recycling, not the raw materials from which those end products were rendered.

Hygrade paid for raw materials based on a yield formula. The yield test was performed by weighing incoming material, processing the material through the rendering facility, and then weighing the finished products. Hygrade developed yield factors based on the results of the yield test.

Hygrade's payments to Recycling were based on (a) the weekly weights of each of the four types of raw material times (b) the applicable yield factors times (c) unit prices less (d) a handling charge. The weights and yield factors were used by Hygrade's accounting department to determine the payments due Recycling. Thus, Hygrade determined both the yield factors and the prices it would pay for the raw materials delivered by Recycling. Hygrade was dependent on Recycling to report accurately how much of each category of raw materials was contained in each load.

Beginning on November 1, 1979, Hygrade was covered by a "comprehensive" fidelity insurance policy issued by National Union that covered, among other things, "[l]oss of [m]oney, [s]ecurities and other property which the Insured shall sustain . . . resulting directly from one or more fraudulent or dishonest acts committed by an Employee, acting alone or in collusion with others." The policy further provided as follows:

> Dishonest or fraudulent acts . . . shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:
> (a) to cause the insured to sustain such loss; and
> (b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees,

bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.
Endorsement 196A, in part.

In 1977, James Laviola became head of Hygrade's rendering department. Shortly thereafter, Recycling began to misstate the proportions of each load that fell into each category of raw materials. There was also substantial deterioration in the quality of the raw materials that Recycling did supply in each category, with the result that it produced substantially less tallow than required by the yield formula. The net result was that Hygrade was being asked to pay for much more tallow than it was actually receiving.

This was apparent to Laviola, who later described the situation to Hygrade's investigator as follows:

> [Laviola said he] was paying top price, but he was knowingly getting what he called junk animal items, blood and guts, and when it was dumped into the pits 25 percent of it would go down the drain. It was just junk.

Laviola brought this up with Leroy Gavin, the owner of Recycling. Gavin's response was to threaten to take his business elsewhere if Laviola insisted on paying Recycling only for the amount of tallow that Recycling actually delivered, rather than for the amount of tallow that it falsely claimed to have delivered. Laviola was afraid that if Recycling went elsewhere with its materials, he would not be able to find a replacement supplier, it would then become uneconomical for Hygrade to continue to operate the rendering department, and Hygrade would shut it down, leaving Laviola without a job.

Laviola's conversations with Gavin produced no improvement in the quality of the materials. Because Gavin was "blackmailing" him, as he put it, Laviola continued to authorize payments to Recycling in accordance with Recycling's inaccurate category breakdown and at the rate specified in the yield formulas. He did this even though he knew that Hygrade was thereby paying for tallow that it had never received. In Laviola's words, contained in a signed confession he later gave to Hygrade's investigator:

> When I would bring this to [Gavin's] attention and tell him I couldn't pay top dollar because of [yield] factors[, h]e would say "you take it all or you get nothing." He was forcing me to accept poor quality tallow and flushings and pay top dollar for it. Much of the load he would bring would go right down the drain through the trap tank.
>
> So we were not getting what we were paying for. And he would blackmail me into accepting it, by threatening to cut off our complete supply, which in my opinion would have shut us [the rendering department] down.
>
> . . . I know what I did was wrong.

Cliff Matteson, Laviola's immediate subordinate, saw that Hygrade was not getting what it was paying for. Matteson instructed his men to keep track of their observations of the recycling raw materials on a form that he devised for that purpose, and he spoke frequently with Laviola about the problem, in discussions that became quite heated. Laviola's response was to order the forms to be destroyed, to direct Matteson to falsify the records of inventory levels, and to tell him to speak to no one else about the problems in the rendering department. Laviola also reported falsely to management that he was regularly testing the raw materials being delivered by Recycling and verifying that Hygrade was getting what it was paying for.

In October 1982, the controller at Hygrade's Tacoma plant deduced that there was a problem in the rendering department and brought it to the attention of Frank Kirk, the general manager. A physical inventory of the department revealed that the actual inventory levels were less than one–twentieth of the levels reported by Laviola. Laviola was summarily suspended from duty and later terminated. Hygrade simultaneously terminated its business relationship with Recycling.

Hygrade proved its loss by four independent methods.

Method 1: Yields of subsequent Recycling deliveries to Seattle Rendering. After Hygrade terminated its business relationship with Recycling in 1982, Recycling began selling

the same raw materials to a company called Seattle Rendering. Unlike Hygrade, Seattle Rendering had state–of–the–art equipment that rendered each supplier's load separately and permitted direct calculation of the amounts of tallow and meat meal yielded.

Over a 2–year period, the materials that Recycling–Yakima delivered to Seattle Rendering yielded an overall average of 25.2 percent tallow. The materials that Recycling–Portland delivered to Seattle Rendering yielded an overall average of 28.7 percent tallow. Both those percentages were far below the 53.8, 46.3, and 45.7 percent that Recycling had been claiming, and Hygrade had been paying, for the same materials in 1982, 1981 and 1980, respectively.

The evidence showed that during 1980 and 1981 about one–third of the deliveries to Hygrade came from Recycling–Portland and about two–thirds came from Recycling–Yakima. In 1982, all the deliveries came from Recycling–Portland. These fractions, applied to the annual net loss figures and to the analogous figures for the deliveries from Recycling–Yakima, yield a net loss figure of $1,522,799 for the 3 years in question.[2]

Method 2: Yield test on last load from Recycling to Hygrade. At the end of October 1982, when Laviola's activities were first discovered, one truckload of unrendered raw materials from Recycling remained on the Hygrade premises. Hygrade tested that load. Overall, including all categories of raw materials, the load produced a tallow yield of only 17.2 percent, as compared with the 53.8 percent tallow yield that Hygrade had been paying for during the preceding fiscal year, and as compared with the 46.3 percent and the 45.7 percent that Hygrade had been paying for in 1981 and 1980, respectively. This tested load was typical of what Hygrade had been receiving from Recycling.

---

[2]The amount of the jury verdict was $1,528,445.

By applying this yield test result to the deliveries made by Recycling during the 3–year period covered by its fidelity insurance policy with National Union, Hygrade calculated by this method that its net loss to Recycling during that period was $2,267,380.

Method 3: Amount paid versus amount received from all suppliers in 1982. As corroboration of the loss figures for the 1982 fiscal year, Hygrade compared the amount of tallow and meat meal actually yielded by the materials from all its suppliers in 1982 with the amount that it paid those suppliers. The amount paid was based on the amount of tallow and meat meal that should have been yielded pursuant to the relevant yield formulas. Since there was evidence that the raw materials from Recycling were the only raw materials with lower yields than expected, the difference was the amount that Laviola had paid Recycling for tallow that Hygrade never received. This method of calculation showed a net loss of $579,806 for 1982.

Method 4: Corroboration by reference to inventory records. Hygrade conducted a physical inventory at the end of the 1982 fiscal year and discovered a discrepancy of $551,327 worth of materials, which falls squarely within the range of damages proven by the other methods described above.

On November 1, 1982, less than a week after Laviola's wrongdoing was discovered, Hygrade notified National Union that Hygrade intended to submit a claim under the policy. On June 7, 1983, following its investigation, Hygrade submitted a proof of loss, which included Laviola's signed confession and calculated the 1982 loss (using method 3 above) at $590,864 (later revised to $579,806) and estimated the 1980 and 1981 loss at "well in excess of $1 million."

Some months later, National Union's investigator flew out to Tacoma and was allowed unlimited access to Hygrade personnel and records. He concluded that the loss figures for 1982 should be $584,463 rather than $590,864. On November 10, 1983, National Union rejected Hygrade's

claim on the basis that Hygrade had failed to prove the requisite dishonesty and intent on the part of Laviola.

On May 10, 1984, Hygrade filed this action, alleging breach of contract and tortious refusal to pay. Each party moved for summary judgment on the issue of policy coverage. The trial court initially granted summary judgment in favor of Hygrade, but reconsidered its decision and denied both motions. After a 3–week trial, the jury returned a verdict in favor of Hygrade in the amount of $1,528,445. Hygrade moved for an award of prejudgment interest, which the court denied. Judgment was then entered on the verdict. This appeal timely followed.

### INSTRUCTION 8

National Union argues that the trial court erred in instructing on the definition of dishonest and fraudulent acts because instead of requiring Hygrade to establish that Laviola acted with manifest intent to cause Hygrade to sustain loss and benefit Recycling, Hygrade was able to argue that the bond required only a want of integrity or breach of trust. National Union also argues that Laviola's continuing raw material purchases from Recycling and other fear–driven actions were poor managerial mistakes, not fraud or dishonesty.

The trial judge instructed the jury with regard to dishonest or fraudulent acts as follows:

A "dishonest or fraudulent" act by an employee is any act showing a want of integrity, a breach of trust, or deceit. Criminal wrongdoing is not required. However, mere negligence, mistake, or error of judgment is not sufficient.

Instruction 8.

▮▮ The trial court should give instructions that conform to pleadings, permit each party to argue his or her theory of the case to the jury and find sufficient evidentiary support in the record. *Grigsby v. Seattle,* 12 Wn. App. 453, 458, 529 P.2d 1167, *review denied,* 85 Wn.2d 1012 (1975). It is not necessary for a court in its charge to define words in common use which are used by the trial judge in the instructions in their conventional sense, since the jury must

be presumed to know their general meaning. A trial court may, and should, define and explain words and phrases used in instructions where they have a technical meaning in law. 75 Am. Jur. 2d *Trial* § 701 (1974).

 A fidelity bond covering losses caused by "fraud and dishonesty" is ordinarily held to extend beyond acts which are criminal, the words being given a broad meaning and being construed most strongly against the surety or insurer. The words "fraud" and "dishonesty," in this connection, are deemed to include any act showing a want of integrity or a breach of trust, or an abstraction of funds, together with deceit and concealment. However, mere negligence, mistake, or error in judgment does not constitute "fraud" or "dishonesty" within the terms of a fidelity bond. 35 Am. Jur. 2d *Fidelity Bonds and Insurance* § 23 (1967); *Mortgage Corp. v. Aetna Cas. & Sur. Co.,* 19 N.J. 30, 115 A.2d 43, 46 (1955).

Applying the above authorities to the facts at bar, the trial court did not err in defining "fraud and dishonesty" in instruction 8. First, fraud and dishonesty have a technical meaning in law and thus may and should be defined and explained in the instructions to the jury. Second, the definition given in the instruction is a correct statement of the law. Furthermore, the evidence indicates that Laviola overpaid Recycling just to keep his department of the company open and thus keep his job, at an alleged loss to Hygrade of over $1 million. This is sufficient evidence of "a want of integrity or a breach of trust or deceit" to support the giving of this instruction.

Accordingly, we find that there was no error with regard to instruction 8.

### INSTRUCTION 9

National Union next argues that the court's instruction on the term "intent" did not provide the jury with the popular and ordinary meaning of the term. Instead, the definition misled the jury into applying a new and different standard from that which appeared in the bond. National

Union also argues the jury's finding of intent is not supported by substantial evidence.

The trial judge instructed the jury with regard to intent as follows:

> A person acts with an intent to achieve a particular result if the evidence demonstrates either (1) that the person wants to achieve the particular result or (2) that the person knows that the particular result is substantially certain to follow from his or her conduct.

Instruction 9.

■ In *Bradley v. American Smelting & Ref. Co.,* 104 Wn.2d 677, 682, 709 P.2d 782 (1985) the court defined "intent" as follows:

> The word "intent" is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.
>
> . . .
>
> Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

*Hartford Accident & Indem. Ins. Co. v. Washington Nat'l Ins. Co.,* 638 F. Supp. 78, 85 (N.D. Ill. 1986) involved the same policy language as is in the present case and analyzed "manifest intent" to benefit a third party as follows:

> Under the contract, it does not matter that the underlying motive for providing third–party benefits was to encourage extended participation in the fraudulent schemes so as to help [defendants] get more money for themselves; as long as a third party is intended to receive a benefit, those third–party benefits come within the terms of the definition of dishonesty if they resulted in a direct loss to [plaintiff]. Thus, if [defendants] engaged in acts with an intent to financially benefit third parties (with other than normal employee benefits) and those acts resulted directly in losses to [plaintiff], then [plaintiff] could seek indemnity under the bonds even though the overall motive for those third–party benefits was only to enable [defendants] to acquire more commissions for themselves.

The term intent has a technical meaning in the law, and thus the trial court was correct in defining it in its instructions to the jury. 75 Am. Jur. 2d *Trial* § 701 (1974). Here,

the trial court's definition of intent is consistent with the definition in *Bradley* above. Furthermore, there is sufficient evidence to support the giving of the instruction. The evidence indicates that Laviola authorized payments to Recycling for tallow that he knew Hygrade had never received. From this evidence, the jury could have found that Laviola either desired or was substantially certain that Recycling would obtain a financial benefit at a direct loss to Hygrade.

National Union argues that Laviola's intent was to avoid closure of his department and that he did not intend to benefit Recycling. However, if Laviola engaged in acts with an intent to financially benefit Recycling and those acts resulted directly in losses to Hygrade, then Hygrade can seek indemnity under the bond even though the overall motive for those third–party benefits was only to avoid closure of the rendering department. *See Hartford Accident & Indem. Ins. Co. v. Washington Nat'l Ins. Co., supra. Hartford* and *Bradley* indicate that only an objective intent suffices.

A secret intent is of no consequence. This is consistent with the language of the policy requiring a manifest intent, as the word "manifest" means apparent or obvious. Here, the manifest or apparent intent was to cause a loss to Hygrade that benefited Recycling.

Accordingly, we find the trial court did not err in giving this instruction and that there was substantial evidence of intent.

## INSTRUCTION 7

National Union next argues that the trial court erred instructing the jury that the term "result directly" was defined to be "proximate cause." National Union also argues that the trial court erred in substituting a technical legal term for a layman's term that is clear and unambiguous and that the court should have allowed the jury to use its own experience and understanding to apply this term in the same manner as the average purchaser of insurance.

Instruction 7 provided as follows:

> When the policy states that Hygrade's loss must "result directly" from one or more fraudulent or dishonest acts, it means that the fraudulent or dishonest acts must have been the "proximate cause" of Hygrade's loss.
>
> The term "proximate cause" means a cause which in a direct sequence, unbroken by any independent cause, produces the injury complained of and without which such injury would not have happened.

■ Where a policy indemnified insured "[a]gainst loss [of life] resulting directly, exclusively and independently of all other causes from bodily injury sustained . . . solely through external, violent and accidental means . . .", the court applied a proximate cause analysis in deciding whether coverage existed. *Hanley v. Occidental Life Ins. Co.,* 164 Wash. 320, 325, 2 P.2d 636 (1931).

Similarly, in *Villella v. Public Employees Mut. Ins. Co.,* 106 Wn.2d 806, 809, 725 P.2d 957 (1986), the insurance policy at issue stated in part:

> We do not cover loss resulting directly or indirectly from:
>
> . . .
>
> 2. *Earth Movement. . . .*

In determining the applicability of the earth movement exclusion, the *Villella* court applied a proximate cause analysis. *Villella v. Public Employees Mut. Ins. Co., supra* at 814–15 (citing *Graham v. Public Employees Mut. Ins. Co.,* 98 Wn.2d 533, 656 P.2d 1077 (1983)).

These authorities indicate that courts apply a proximate cause analysis when confronted with the term "resulting directly" in an insurance policy. Accordingly, we find that the court did not err in instructing the jury that "result directly" may be defined as proximate cause.

### Reasonable Basis for Damages

■ National Union argues that Hygrade's damages were speculative. Damages that are remote or speculative cannot be recovered. *Larsen v. Walton Plywood Co.,* 65 Wn.2d 1, 16, 390 P.2d 677, 396 P.2d 879 (1964). However, a recovery will not be denied because the amount of damage is incapable of exact ascertainment if the evidence is sufficient to

afford a reasonable basis for estimating the loss. *Hartman v. Anderson,* 49 Wn.2d 154, 160, 298 P.2d 1103 (1956). More specifically, in an action to recover on a fidelity bond, where it is established with certainty that a loss covered by the bond has occurred, it is not necessary to recovery that the amount of loss be proved with mathematical certainty where that is impossible. 35 Am. Jur. 2d *Fidelity Bonds and Insurance* § 97 (1967). It is enough if there is a basis for a reasonable inference as to the extent of the damages sustained.

■ An appellate court should not disturb an award of damages made by a jury unless the award is outside the range of substantial evidence in the record, shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice. *Bingaman v. Grays Harbor Comm'ty Hosp.,* 103 Wn.2d 831, 835, 699 P.2d 1230 (1985).

There is substantial evidence in the record to support the jury's award in the present case. Hygrade proved its loss by two primary methods of calculation and corroborated the results by two additional methods. In the first method, Hygrade compared the materials delivered to it with those delivered to Seattle Rendering. National Union criticizes this method on the basis that the materials delivered to Seattle Rendering were different from those delivered to Hygrade. However, both a former driver for Recycling, Claude Elkins, and Recycling's former owner Leroy Gavin, conceded that the materials were the same.

National Union criticizes Method 2 on the grounds that the extrapolation for the last load to the previous ones was "speculative." However, Cliff Matteson testified that the load tested by Hygrade in October of 1982 was "pretty typical" of the loads that Hygrade had been receiving over the previous 3 years.

Finally, National Union argues that Hygrade's proof of loss fails to take into account other factors that might have

explained why the actual yields of the October 1982 test load (Method 2) and the overall actual yields from all suppliers' materials (Method 3) failed to correspond to the amount paid by Hygrade during those periods. National Union argues that the loss claimed by Hygrade might have been due to "loss associated with deliveries by other sources" or "loss associated with other in–house problems," such as "defective equipment" and "bad management". Brief of Appellant, at 39, 40.

The first factor, "loss associated with deliveries by other sources" is inapplicable to Method 2, since the test load contained materials from only Recycling. That factor is also inapplicable to Method 3, since there was evidence that the raw materials from Recycling were the only raw materials with lower yields than expected.

The second factor, "loss associated with other in–house problems," was never shown by National Union to have any effect on the test yields.

Accordingly, we find that there was a reasonable basis for the jury's award of damages in the present case.

### Inapplicability of Policy Exclusions

National Union argues that Hygrade based its damage claim upon the inventory computation and the profit and loss computation, which are impermissible computations, and that the trial court improperly refused an instruction on the computation exclusion. National Union also argues that Hygrade's claim is not covered because it is a claim for "potential income," and that the trial court erred in refusing to instruct the jury as to the issue of potential income.

Hygrade argues that National Union waived its claim of error by failing to propose instructions explaining the exclusionary clauses in terms understandable to a jury. Hygrade also argues that the policy exclusions do not apply because its calculation of its loss was not dependent upon an "inventory computation," or a "profit and loss computation," and its claim was not based on "potential income."

The first exclusion at issue provides as follows:

Section 2. This Policy does not apply:

. . . .

"(b) . . . to loss, or that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation.

Endorsement 200.

An "inventory computation" is defined as follows:

"An inventory computation is an inventory arrived at by taking a beginning inventory, adding purchases and deducting the cost of merchandise sold. A computed inventory loss, therefore, would be the difference arrived at by deducting an actual inventory from the inventory computation.

*Fort Smith Tobacco & Candy Co. v. American Guar. & Liab. Ins. Co.,* 208 F. Supp. 244, 254 (W.D. Ark. 1962). *See also Fidelity & Deposit Co. v. Southern Utils., Inc.,* 726 F.2d 692, 695 (11th Cir. 1984); *Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.,* 61 F.R.D. 120, 124 (N.D. Ga. 1973).

The case law surrounding the inventory computation exclusion is unclear. *See* Annot., 45 A.L.R.4th 1049 (1986). Courts differ both as to what exactly falls within the definition of an inventory computation and the effect of the clause excluding inventory computations once its applicability to a particular method of proving loss is shown. 45 A.L.R.4th 1049 § 2(a) (1986).

A number of courts hold that the term "inventory computation" would not include inventories based on physical count of individual items as compared to previous physical counts. *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.,* 60 N.Y.2d 390, 457 N.E.2d 761, 469 N.Y.S.2d 655, 45 A.L.R.4th 1037 (1983); 45 A.L.R.4th 1049 § 4(a) (1986). In the present case, however, Hygrade's Method 4, which involved deducting the actual inventory on hand with the inventory as recorded on the company books, falls within the above definition of an inventory computation, as it is not based on physical counts of individual items.

■ Nevertheless, Method 4 was a small element of Hygrade's proof of loss. Hygrade produced three other methods of proving its loss and claims that the fourth method was only to corroborate the other methods. In addition, there existed substantial evidence of Laviola's dishonesty, including his confession. Accordingly, we find that the trial court did not err in deciding as a matter of law that the exclusion did not apply because the proof of loss was not "dependent upon" an inventory computation.

■ Nor was proof of loss dependent upon a profit and loss computation. A "profit and loss computation" has been defined as "a subtraction of expenses from gross receipts." *Fidelity & Deposit Co. v. Southern Utils., Inc., supra* at 695; 45 A.L.R.4th 1049 § 2(a) (1986). None of the methods used by Hygrade to show loss involves such a computation.

National Union cites *Mapes Casino, Inc. v. Maryland Cas. Co.,* 290 F. Supp. 186, 193 (D. Nev. 1968), in which the claimed loss was based solely on an unusually low percentage of wins from a casino crap game. National Union argues that the importance of *Mapes* is that it holds that a court will not consider a damage claim arrived at by a comparison of actual "take" compared with expected "take." *Mapes Casino, Inc. v. Maryland Cas. Co., supra* at 193. *Mapes* is not applicable to the case at bar because Hygrade is not trying to base its claim on an expected profit; rather, it is trying to ascertain the amount by which Recycling was overpaid.

Finally, National Union claims that Hygrade's claim is not covered by the bond because it is a claim for "potential income," which is excluded as follows:

In addition to the existing Exclusions in the attached Policy, the Company shall not be liable under any Insuring Agreement for:
(i) Potential income, including but not limited to interest and dividends, not realized by the insured because of a loss covered under this Policy.

Endorsement 196A, in part.

The damage sought in the present case is not potential income. Rather, Hygrade seeks damages equaling the amount by which Recycling was overpaid. Thus, National Union's argument that Hygrade's claim falls within the potential income exclusion is without merit.

Accordingly, we find that the trial court properly held that none of the policy exclusions applied.

### PREJUDGMENT INTEREST

Hygrade argues that the trial court should have awarded prejudgment interest since it was clear that the jury arrived at its verdict by a process of calculation from evidence of concrete facts, without reliance on opinion or discretion.

■■■ *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968) stated the rule at page 32:

> [I]nterest prior to judgment is allowable (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

This rule is cited with approval in the recent case of *Hansen v. Rothaus*, 107 Wn.2d 468, 472, 730 P.2d 662 (1986).

A "liquidated" claim is a claim "'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Hansen v. Rothaus, supra* at 472 (quoting *Prier v. Refrigeration Eng'g Co., supra*) (quoting C. McCormick, *Damages* § 54 (1935)).

> An unliquidated claim, by contrast, is one
> "where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed."

*Hansen v. Rothaus, supra* (quoting *Prier v. Refrigeration Eng'g Co., supra* at 473).

Prejudgment interest is not appropriate in this case because the jury had to exercise its discretion in reaching a verdict in an amount which could have been substantially

more or even less and still have been within the evidence presented.

Judgment affirmed.

SWANSON and WEBSTER, JJ., concur.