**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellant,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant–Appellee.**

**No. 90–5942.**

United States Court of Appeals, Sixth Circuit.

Argued May 10, 1991.

Decided Aug. 26, 1991.

William R. O'Bryan, Jr., Mary Thomson LeMense, Trabue, Sturdivant & DeWitt, Nashville, Tenn., and Eugene J. Comey (argued and briefed), Tuttle & Taylor, Washington, D.C., for plaintiff-appellant.

Roger A. Milam (argued and briefed) and Thomas T. Pennington, Denney, Lackey & Chernau, Nashville, Tenn., for defendant-appellee.

Before KEITH and BOGGS, Circuit Judges, and RUBIN, District Judge.*

BOGGS, Circuit Judge.

The Federal Deposit Insurance Corporation ("FDIC"), as the successor in interest to Farmers Bank and Trust ("FBT"), a failed federal savings bank, filed this lawsuit against St. Paul Fire and Marine Insurance Company, asserting four claims under a bankers blanket bond issued to FBT by St. Paul. After a bench trial, the district court, in an extensive and thorough opinion, made findings of fact and conclusions of law. *FDIC v. St. Paul Fire and Ma-*

---

* The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

*rine Ins. Co.,* 738 F.Supp. 1146 (M.D.Tenn. 1990).

The FDIC asserts its claim under a "dishonesty clause" and a "forgery clause" in the fidelity bond. The dishonesty clause issues involve Gary Ramsey, the former president and CEO of FBT. The FDIC made a number of claims under the dishonesty clause, relating to various payments approved by Ramsey and loans that he approved without following proper procedures. The district court found in favor of the FDIC on some claims, relating to various fraudulent payments, and St. Paul has not appealed. However, the court found against the FDIC on the largest claim—resulting from the bad loans approved by Ramsey. The FDIC now appeals this judgment, and we affirm the district court.

The FDIC also alleged that a guarantee on a promissory note signed by Sonya Butcher was forged, and that this forgery resulted in a loss covered by the applicable clause of the blanket bond. The district court also found in favor of St. Paul on this claim. Because we believe that the district court erred by ignoring the terms of a stipulation entered into by the parties, we reverse and remand for reconsideration.

I

THE DISHONESTY CLAUSE

A

Farmbanc, a stock holding company created for the specific purpose of holding FBT stock, was the sole owner of FBT. Gary Ramsey was one of several Farmbanc shareholders. Ramsey also served on the FBT Board of Directors and as the President and CEO of FBT. In 1980, when Ramsey was elected President and CEO of the bank, he earned $50,000 a year. Ramsey seems to have had a somewhat casual attitude regarding the separation between his personal financial affairs and those of FBT.

The claim that the FDIC won below, which we mention only by way of background, had to do with payments to Consolidated Financial Service, a consulting firm that gave advice to the bank regarding insurance and marketing services. Jake Cantrell and Russell McGee, two shareholders in Farmbanc, managed Consolidated Financial. Consolidated Financial was owned by a holding company known as Rhea Bancshares, and every dollar made by Consolidated Financial was passed through to Rhea Bancshares. In November 1982, Ramsey became a shareholder in Rhea Bancshares, giving him a direct financial interest in Consolidated Financial. Ignoring the normal procedures for dealing with potential conflicts of interest, Ramsey hired Consolidated Financial to provide consulting services for FBT. FBT policy, if followed, would have required Ramsey to reveal his financial stake in the transaction to the board of directors and to recuse himself from involvement in the decision to hire the company. Instead, Ramsey made the decision unilaterally, and he kept the board in the dark. Nonetheless, the district court found in favor of St. Paul on the claim for the payments made to Consolidated Financial because it concluded that Consolidated Financial provided some financial and marketing services, and the FDIC did not demonstrate that the services were not worth what was paid for them. *St. Paul,* 738 F.Supp. at 1159. The FDIC has not appealed this aspect of the district court's judgment.

There were, however, two payments, totalling $54,000, that were made directly to Jake Cantrell, who used the money to service his personal debts. Ramsey claimed that he authorized these payments because he was in debt to Cantrell "both personally and financially." The court found in favor the FDIC on this claim. In addition, Ramsey authorized the payment of about $170,000 in "executive committee fees" to himself and to Cantrell. He and Cantrell used this money to service the debts that they had incurred in acquiring Farmbanc. At trial, the FDIC demonstrated that these payments were, indeed, fraudulent. The district court characterized these payments to Cantrell and Ramsey as "pure embezzlement." *Id.* at 1161. Accordingly, the court entered judgment for the FDIC for $224,000. We reiterate, however, that al-

though St. Paul contested the claims at trial, it has chosen not to appeal that judgment.

By far the more significant losses, however, came not from actual embezzlement but from the approval of bad loans. The FDIC lost on these claims, and it now appeals. Ramsey approved a number of loans, again without going through the proper procedures, that resulted in losses. These loans, often to his friends or to entities in which he had a financial stake, were, at least according to the FDIC, substantially more risky than the FBT would have approved, had normal procedures been followed.

First, Ramsey approved loans to several individuals to purchase Rhea Bancshares stock. He did so without making normal credit checks and without going through the normal mechanisms for approving loans. Since he himself had a financial interest in Rhea Bancshares, he directly violated the FBT policy forbidding bank officers from processing loans in which they have a financial interest. Second, Ramsey loaned money to investors in the Century Motor Company. As with Rhea Bancshares, Ramsey had a direct financial interest in that company. This money, although loaned to various individuals, was used to reduce the indebtedness of Century Motors. Third, Ramsey approved loans to Donald Wilson, another friend of his, to finance a condominium project in Smyrna, Tennessee, the site of the new General Motors Saturn plant. Again, Ramsey had a financial interest in the project.

These loans did not pan out. *In toto*, these loans resulted in a cumulative loss of about $1.4 million. With prejudgment interest, the total claim by the FDIC is over $2.2 million.

### B

FBT failed, and was taken over by the FDIC. In its corporate capacity, the FDIC purchased certain rights, including the rights under a bankers blanket bond, for which St. Paul was the underwriter. That bond contains a "dishonesty clause." St. Paul agreed to insure against:

(A) Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others.

Dishonest or fraudulent acts as used in this Insuring Clause shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

It is this clause that the FDIC invokes in order to claim that St. Paul should have to pay back the loans. The district court ruled in favor of St. Paul.

### C

The clause at issue here allows recovery where three conditions are satisfied. First, the employee's actions must be "dishonest or fraudulent." Second, the employee must receive compensation not normally received in the ordinary course of business as a part of his or her job. And, third, the employee must act with the "manifest intent" to cause the injury to the insured. In ruling against the FDIC, the district court concluded both that Ramsey had acted dishonestly and that he had done so to obtain benefits other than those to which he would normally be entitled to during the course of business. *See St. Paul*, 738 F.Supp. at 1156–57. Thus, the court held that the first two elements had been satisfied. The court held, however, that the third element was not satisfied. Ramsey did not act with the "manifest intent" to cause the loss. *Id.* at 1158. The court noted that Ramsey had a significant financial stake in the bank. *Ibid.* Indeed, the failure of FBT would have caused (and did end up causing) Ramsey's financial ruin. The court then reasoned that, "Ramsey could have only intended to cause the

bank to sustain a loss on the loans if he also intended to wipe out a vast portion of his assets in the process, including his ownership interest in FBT. The evidence does not indicate that Ramsey has such a financially suicidal intent." *Id.* at 1159.

The question presented is, therefore, whether Ramsey acted with the "manifest intent" to cause the loss to FBT. We differ somewhat with the district court regarding how it reached its conclusions, but its findings on the "manifest intent" issue are essentially correct. The FDIC maintains that the district court erred in interpreting our decision in *Municipal Securities v. Insurance Company of North America*, 829 F.2d 7 (6th Cir.1987), to require a sole focus on "subjective intent." *St. Paul*, 738 F.Supp. at 1158. The FDIC invokes the principle that one is presumed to intend the natural and probable consequences of one's actions. *See, e.g., United States v. Cooper*, 577 F.2d 1079, 1082–83 (6th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). This sensible-sounding principle has been undermined in recent years, at least in the context of the criminal law. *See, e.g., Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Yates v. Evatt*, — U.S. —, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).

Nonetheless, even in the criminal context, a trier of fact *can* make inferences regarding intent based on the natural and probable consequences of actions. It could hardly be otherwise. Intent, as used in ordinary language, is thought to refer to a subjective phenomenon that takes place inside people's heads. In fact, however, the word "intent" is really shorthand for a complicated series of inferences all of which are rooted in tangible manifestations of behavior. For us, the external behavior ordinarily thought to manifest internal mental states is all that matters. We need not concern ourselves with the question of whether mental states *actually* exist, as an ontological matter. *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990) ("A secret intent is of no consequence."). Although the district court employed the language of "sub-jective intent" as if it believed that the case turned entirely on inner thoughts, it relied, in its analysis, on external indicia of subjective intent—as it had to.

The FDIC focuses its argument on the term "intent," and it attempts to ignore the word appearing just before "intent"— "manifest." The clause at issue here was introduced in 1976, and has been adopted throughout the fidelity insurance industry. *Hartford Accident and Indem. Ins. Co. v. Washington Nat'l Ins. Co.*, 638 F.Supp. 78, 81 (N.D.Ill.1986). "Manifest intent," in such a provision, means "apparent or obvious." *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990). Although the concept of "manifest intent" does not necessarily require that the employee actively wish for or desire a particular result, it does require more than a mere probability. *See ibid.* (manifest intent exists when a particular result is "substantially certain" to follow from conduct).

In the *Municipal Securities* case, we dealt with policy language identical to the language here. Hargraves, the employee in that case, had been hired as a trader by Municipal Securities, a broker-dealer specializing in government bonds. *Municipal Securities*, 829 F.2d at 8. Hargraves was somewhat overenthusiastic in the performance of her duties. She had been told that she could only have $2 million worth of securities in her inventory at any one time; shortly, however, she "began making trades that took her far beyond the $2,000,-000 inventory limit." *Ibid.* Hargraves concealed the trades from her employer. She evidently wanted to recoup her prior losses, because the losses would have adversely affected both her job security and her commission. By the time she was discovered, she had managed to run up a long position of over $56 million; her accounts were closed out at a loss of almost $1 million.

Had we applied the standard suggested by the FDIC, we would certainly have found that Hargraves had the manifest intent to defraud her employer. There is

nothing more "natural and probable" than that a young securities trader who gets over her head and exceeds her inventory limit will suffer large losses. This is probably why Municipal Securities imposed the limit in the first place. We nonetheless held that her conduct did not fall within the terms of the bond, since her manifest intent "was to make money, not to cause her employer to lose money." *Id.* at 9.

The Second Circuit reached a similar conclusion on almost identical facts in *Glusband v. Fittin Cunningham & Lauzon, Inc*, 892 F.2d 208 (2d Cir.1989). There, Starbuck, another securities trader, did the same thing that Hargraves did—got over his head, concealed losses, and ran up new losses trying to get the old losses back. The Second Circuit held that this did not constitute "manifest intent" to injure in a broker's bond using the language at issue here. As the court explained, "the evidence indicated that Starbuck intended to benefit [the insured], no matter how reckless and imprudent his conduct may have been." *Id.* at 210.

Recently, the Tenth Circuit reached the same conclusion in another similar case. *First Fed. Sav. & Loan Ass'n. v. Transamerica Ins. Co.*, 935 F.2d 1164 (10th Cir. 1991). In that case, the employee arranged for loans by dishonestly filling out loan applications for people who did not meet his employer's standards for credit-worthiness. The court held the employee lacked the necessary manifest intent to cause the injury.

In sum, this clause covers fraud, not bad business judgment, whether that be characterized as "reckless and imprudent," *Glusband*, 892 F.2d at 210, or just plain "poor." *First Federal*, 935 F.2d at 1167. The distinction that underlies *Municipal Securities, Glusband,* and *First Federal* is the distinction between *fraud* and *overreaching*. As one court explained, after parsing the language of this provision,

"[t]he paradigmatic scheme that would be covered by the [clause at issue here] is an embezzlement." *Verex Assurance, Inc. v. Gate City Mortgage Co.*, C–83–0506W, 1984 WL 2918 (D.Utah, Dec. 4, 1984).

Although we believe that the district court ruled correctly in this case, this is a harder case than either *Municipal Securities* or *Glusband.* One fact made those cases easy: the actions of the employee, no matter how unlikely they were to succeed in making money, by their very nature, could only make money if the insured did so as well. Both benefited, or both lost, together. Thus, the courts had an easy time ascertaining that the employee lacked the requisite "manifest intent."[1] Embezzlement—the classic case that is covered by this blanket bond provision—is starkly different. Embezzlement is a zero-sum game. For the employee to win, the employer must lose. Ramsey's conduct falls somewhere in the middle. He benefitted, somewhat, from making the bad loans. He almost certainly wanted the loans paid back; he was not indifferent. At the same time, the bank could suffer some level of loss and he might still come out ahead, if the lost money went to shore up enterprises in which his ownership proportion was larger than it was in the bank.

At this point, the issue is almost purely a factual judgment, and we see no reason to believe that the district court was clearly erroneous in its factual determination. The FDIC argues that the "financial suicide" approach employed by the district court just *has* to be wrong, since, by his other actions that were pure embezzlement, Ramsey demonstrated a willingness to injure the bank. This doesn't necessarily follow, however. As a shareholder in Farmbanc, Ramsey would suffer an injury, proportional to his share in the bank, if the bank suffered a relatively minor loss. By siphoning money from the bank's pocket to his pocket, he cost himself (as shareholder) a little bit of money, but he benefited him-

---

**1.** This is not to say that conduct that also would benefit an employer, if successful, could *never* constitute a "manifest intent" to cause the injury. Some schemes—like loaning a buddy money to go off to Las Vegas and win it back at the craps tables—are so inherently ludicrous that a court might conclude that the requisite intent was present despite the fact that the employee could only benefit directly if the employer did as well.

self (as recipient of the embezzled funds) far more. The people who really lost out, of course, were his fellow shareholders. The loans, however, are a somewhat different story. The loans that he approved gave him an attenuated benefit at most proportional to his share in the benefited enterprises. It is not at all clear that the benefit to him would have outweighed the potential loss through Farmbanc. Thus, it is quite consistent to say that Ramsey could simultaneously have the intent to steal relatively small amounts of money from the bank through the executive committee fees, but that he did not have the necessary intent to steal in making the loans.

In any event, we think the district court correctly determined that it was highly unlikely that Ramsey had the "manifest intent" to cause a significant injury to an entity in which he had a major financial stake. Furthermore, the loans approved by Ramsey went to help his friends invest in enterprises that he had a financial stake in. If the phrase "put your money where your mouth is" says anything about human nature, it means that Ramsey sincerely hoped that those enterprises would flourish, and supply the need stream of income to pay off the loans.[2] He turned out to be wrong. This mistake is, however, no different qualitatively from the mistakes in *Municipal Securities, Glusband,* or *First Federal.* Like the FDIC, we are disturbed by Ramsey's apparent indifference for the distinction between his own personal affairs and those of FBT. His actions may have constituted a grave breach of his fiduciary duty. Nonetheless, we do not believe that they fall within the operative language of the fidelity bond. And the district court was right about one thing: when the whole house of cards came crashing down, Ramsey was the one pinned under the wreckage.

## II

### THE FORGERY CLAUSE

The FDIC's other assignment of error has to do with the coverage in a forgery clause of the blanket bond. Jake Butcher was the president of Bull Run Oil. In exchange for a loan, Bull Run Oil executed a promissory note payable to FBT in the amount of $1.432 million. This note was not secured, but it was guaranteed by Jake and Sonya Butcher. Jake and Sonya Butcher have encountered well-publicized financial problems of their own. Bull Run Oil is bankrupt, as are Jake and Sonya Butcher. The FDIC has classified the Bull Run Oil promissory note as a "lost account" because of these various financial problems.

The FDIC believes, however, that the signature of Sonya Butcher on the note was forged. Thus, the FDIC invokes the coverage of the forgery clause of the fidelity bond, which provides for coverage "[f]or loss resulting directly from the Insured having, in good faith, for its own account or the account of others ... extended credit ... upon any original ... security agreement which bears the signature of any ... guarantor ... which is a forgery."

Although the district court's finding discussed the possibility that she authorized or ratified the signature of someone else, *see St. Paul,* 738 F.Supp. at 1155, the basis of the court's decision seems to have been that the FDIC failed to prove that Sonya Butcher did not sign the document. The district court found her testimony to be inherently not credible based, in part, on the circumstances of the claim. "Mrs. Butcher first asserted the signature to be a forgery as a defense to an involuntary bankruptcy petition which had been filed against her in 1983.... Facing the pros-

---

**2.** We think that the FDIC makes the mistake of taking the "financial suicide" language too literally. We read the district court's language to be a bit of hyperbole intended to illustrate its point. Certainly, one can develop scenarios that would leave FBT worse off and Ramsey better off. For example, we can imagine that the enterprises might be profitable enough to make money for Ramsey, but not profitable enough to supply the income necessary to pay off the loans. The loans were, after all, made to individual investors, not to the enterprises themselves. Given the concatenation of interests, here, however, we think it far more likely that Ramsey's intent was that everyone—including FBT—benefit.

pect of being involuntarily declared bankrupt, Sonya Butcher had an obvious interest in avoiding liability upon the Bull Run note by denying the validity of her signature. Facing a possible charge of perjury if she changed her story, Sonya Butcher had a continued interest in claiming the signature to be forged when she testified in this action." *Id.* at 1154. Further, the court noted that her husband did not testify and that her testimony was not corroborated by a handwriting expert. *Id.* at 1155. Based on its own perusal of the signature, the court declared that "[t]he signature on the guarantee does not differ significantly from her signature upon an unrelated promissory note which she admits to be authentic." *Ibid.*

■ There is certainly nothing wrong, *a priori* with the district court's factual conclusions. Normally, we would not hesitate to uphold such findings. We believe that, on the whole, the district court did an excellent job in carrying out its duty as the trier of fact. In this case, however, prior to trial, the parties entered into a set of stipulations. They stipulated that "Sonya Butcher did not place her signature upon the guarantee marked and described as Exhibit 6 herein...." Stipulations voluntarily entered by the parties are binding, both on the district court and on us. *Unicore, Inc. v. Tennessee Valley Auth.,* 768 F.2d 109, 112 (6th Cir.1985); *Brown v. Tennessee Gas Pipeline Co.,* 623 F.2d 450, 454 (6th Cir.1980). *See also Morelock v. NCR Corp.,* 586 F.2d 1096, (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

Stipulations serve the purpose of conserving judicial resources and allowing the parties to focus on truly disputed issues. Everyone benefits when parties agree to make stipulations. It saves the parties the time and money of proving facts that are not in dispute but that are nonetheless necessary to the outcome of the dispute. It saves time and energy for judges and juries who don't have to hear evidence about what the parties are willing to agree about. And it saves the public money, by making trials shorter and clearing space on the docket. In order for this system to work, however, the parties must be able to depend on the stipulations. If a trial judge can, as here, ignore a clear stipulation of the parties, the incentive to enter stipulations is eliminated. Worse yet, it offers a whole new ground for strategic behavior, as parties can try to get the trier of fact to pass on matters that have already been agreed to.

St. Paul chose, for whatever reason, to enter into a stipulation that the signature was inauthentic. In so doing, it told the FDIC, in effect, that there was no need to put on evidence that the signature was inauthentic. Nor does our view of whether the judge got the facts right affect the proper outcome.[3] Stipulations are entered into in a bargaining process. Perhaps, in exchange for agreeing that the signature was forged, St. Paul got some other admission from the FDIC. In any case, the parties entered into the agreement prior to trial, based on their attorneys' views regarding what could be proven and what couldn't. Perhaps St. Paul miscalculated, but such miscalculations are a part of the litigation process (if it was a miscalculation—perhaps the FDIC had, waiting in the wings, an expert who could demonstrate conclusively that Sonya didn't sign the document). The court's action deprived the FDIC of the benefit of its bargain. Doing so not only hurts these parties, but it hurts future parties who won't be able to rely on their bargains, and, hence, will be less likely to make them. Accordingly, we believe that the trial judge, sitting as the trier of fact, was bound by the parties' stipulation.

**3.** This is not to say that the parties could stipulate patently untrue "facts." A trial judge may have some authority to to reject stipulations. *See Jeffers v. United States,* 588 F.2d 425, 427 (4th Cir.1978). However, we believe that if the trial court wishes to reject a stipulation, the court must at least give the parties notice of its intent, so that the parties will be able to demonstrate the reasonableness of the stipulation. Moreover, since the stipulation at issue might be part of a package deal, the party that wants the stipulation should have the right to renegotiate the total package. In any event, the stipulation here is well within the range of possibly true facts and legitimate litigation strategies.

We therefore remand for further consideration. In so doing, the court is bound by the parties' stipulation that Sonya Butcher did not place her signature on the guarantee. The court is free to consider any other issues that were properly presented.

### III

The district court's ruling on the dishonesty clause is AFFIRMED. The court's ruling on the forgery clause is VACATED and REMANDED for further consideration in light of this opinion.