659 A.2d 991

**SUSQUEHANNA BANCSHARES, INC. and The Citizens National Bank of Greencastle, Appellants,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 19, 1994.

Filed April 25, 1995.

Reargument or Reconsideration Denied July 7, 1995.

M. Duncan Grant, Philadelphia, for appellants.

Melvin Shuster, Philadelphia, for appellee.

Before BECK, HUDOCK and BROSKY, JJ.

HUDOCK, Judge:

In this appeal we must interpret the phrase "manifest intent" as used in a fidelity bond which protects a bank from losses caused by an employee acting with the "manifest intent" to cause such losses.

In September, 1986, Citizens National Bank of Greencastle (the Bank)[1] sustained losses in excess of $1.4 million as a result of defaulted trailer truck loans made to seventeen truckers through its installment lending department. The Bank's employee in charge of that department, Marvin Rice (Rice), had originated or overseen many of the loans and, in September, 1986, was terminated by the Bank. At that time, the reason given for Rice's termination was failing to exercise sound judgment in granting and administering the loans. On September 2, 1986, the Bank and SBI submitted a claim to National Union Fire Insurance Company (National Union) of Pittsburgh, characterizing Rice's conduct as dishonest or fraudulent so that the Bank and SBI might obtain fidelity coverage under the financial institution bond (the bond) issued by National Union. The bond, which went into effect on November 18, 1985, defined "dishonest or fraudulent acts" as follows:

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the *manifest intent*

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of

1. Susquehanna Bancshares, Incorporated (SBI) is a bank holding company. SBI acquired the Bank on October 1, 1985.

employment.[2]

Banker's Bond, at p. 2 (emphasis added).

Specifically, the Bank and SBI alleged that the following acts were done with the manifest intent to harm the Bank:

1.  changing and extending due dates on loans for less than the standard one percent fee;

2.  fraudulently administering loans;

5.  lying to the bank's loan committee and board of directors to conceal his activities from them;

4.  making new loans and refinancing loans to customers with a known history of not paying bills;

5.  misleading bank officers, the internal and external auditors, and examiners from the OCC [Office of the Comptroller of the Currency] about the delinquent status of borrowers' accounts; and

6.  making severely under-collateralized loans.

Trial Court Opinion, 6/8/93, at p. 39.

Following National Union's denial of coverage, the Bank and SBI instituted an action for breach of contract under the bond against National Union. A fifteen day bench trial followed, at which extensive evidence was taken. At the conclusion of the trial, judgment was entered in favor of National Union. In so concluding, the trial court, after making close to 200 findings of fact, stated that Rice did not act with a manifest intent to harm the Bank, but rather, his actions were the product of the lending environment at the Bank which had been plagued by years of mismanagement, lax supervision, and widespread unsound banking practices. Post-trial motions were filed and denied by opinion and order dated February 11, 1994. This appeal followed. We affirm.

The parties are in substantial agreement as to the facts of the case as found by the trial court, but differ as to the necessity of the findings and as to their legal application. Rice began his employment with the Bank in 1969, and from

---

2.  The parties have stipulated that there has been no financial gain to Rice himself. The sole benefits came to the truckers.

1973 until 1976 he was employed as the Bank's head teller. In 1976, Rice was transferred to the installment loan department where he was trained in his capacity as a loan agent by Donald Barnhart. In 1980, Rice became manager of this department and subsequently, in 1985, became the head of all of the Bank's lending departments. Rice remained in this capacity until April of 1986, when it was discovered that Rice had been allowing loan extensions on tractor trailer loans without charging the proper extension fee. It is important to note that from 1983 to 1985, due to a deregulation in the trucking industry, the Bank's tractor trailer loans substantially increased.

As manager of the installment loan department, Rice was in charge of compiling a list that represented all accounts which were past due. These past due reports, or delinquency lists, showed installment loans which were thirty, sixty, or ninety days past due. The delinquency reports were sent to the Board of Directors and to the loan committee for examination. As manager of the installment loan department, Rice had the authority to extend and/or refinance past due loans. Although the Bank had no written policy concerning extension fees, it was understood that a one percent fee [3] was required whenever a loan was extended beyond its original due date. Donald Barnhart testified that when he was in charge of the loan department, extensions were allowed only when the bank customer encountered difficulty in paying the loan due to illness or loss of job. Rice likewise testified that he had the same justification for granting extensions. However, as a result of the problems incurred by the Bank's borrowers, Rice often charged less than the one percent fee for extensions.[4] However, the record reveals that as early as 1984, Rice often would change a loan's due date without collecting any fee.[5] Rice reasoned that by not charging a fee, he could better work

3. This fee represents one percent of the outstanding balance of the loan.

4. When less than a one percent fee was charged, it was considered that a "bump" occurred.

5. The Bank and SBI claim $119,926 as a result of losses for failure to charge extension fees.

with the customer in order to get the loan paid. The extensions granted by Rice were in no way concealed and, in fact, were documented in the daily exception book by one of his secretaries. As well as not charging extension fees, Rice often refinanced past due loans in order to keep them off the delinquency list. It is argued by the Bank and SBI that this judgment by Rice caused loans to be under-collateralized. The record also reflects problems with the Bank's managerial structure. As head of the installment loan department, the only person superior to Rice was Donald Barnhart, the Bank's President. In his capacity as president, Barnhart did not review any of the daily exception lists compiled by Rice. This is so because Barnhart delegated much authority to his employees and conducted little or no supervision over them. Further, the Bank is known as a community bank, thus, much weight is given to the character, collateral and capacity of a customer who is seeking a loan. Because of this policy, it is important to note that Rice had a $20,000 lending limit, but was issuing loans close to $70,000. In fact, ten to twenty percent of the installment loans issued by Rice exceeded his lending limits. An internal audit conducted by Mary Naylon concluded that many of the loan applications in the installment loan department contained incomplete information, such as lack of salary data. Likewise, the Office of the Comptroller of the Currency (OCC) was sharply critical of the Bank's lack of good management. The OCC noted severe deficiencies in the Bank's loan portfolio management.

In determining whether National Union is liable on the bond issued to the Bank, we must determine the meaning of "manifest intent" as used in the bond since the bond itself does not include a definition of the phrase. Although there are many conflicts in the case law on this subject, we have found essentially two distinct lines of cases from other jurisdictions which have dealt with actions under the "manifest intent" language of banker's bonds. The Bank and SBI, in accord with the first set of cases to be discussed below, argue that in determining an employee's manifest intent, the trial court should have only considered the natural and probable

consequences of the employee's acts and should ignore his subjective intent. In so arguing, the Bank and SBI insist that this purely objective test is easily applied and should be the standard adopted by this Court because it is also applied in other areas of the law, including criminal, contract, and tort. The Bank and SBI further add that should this Court adopt the natural and probable consequences method of determining the manifest intent of the employee, the trial court's detailed factual findings should be deemed to be irrelevant. Under this approach, only two questions need to be asked: (1) did the employee commit the acts? and (2) were the natural and probable consequences of these acts financial harm to the Bank and benefit to himself or others? If the answer to these questions is yes, then judgment must be entered in favor of the Bank and SBI as a matter of law.

The cases of *United States Fidelity & Guaranty Co. v. Citizens Bank of Tazewell*, 718 F.Supp. 471 (W.D.Va.1989) and *National Bank of Pakistan v. Basham*, 142 A.D.2d 532, 531 N.Y.S.2d 250 (1988), *aff'd.*, 73 N.Y.2d 1000, 541 N.Y.S.2d 345, 539 N.E.2d 101 (1989), follow this line of reasoning that the employee's intent is to be determined solely from the natural and probable consequences of his acts. In *Tazewell*, John H. Rife, an Executive Vice–President and Chief Executive Officer of Citizens Bank of Tazewell (Citizens), was contacted by Lewis Hannum, who was seeking a $400,000 loan from Citizens in order to fund the Tazewell Farmers Mart. Citizens' Executive Committee voted to defer issuing the loan until Citizens could find another bank that would participate in the loan. Without finding a participating bank, Rife authorized two separate loans to Hannum, one for $252,000 and one for $80,000. Hannum subsequently requested another loan in the amount of $100,000 from Citizens. The First National Bank of Keystone, after negotiating with Rife, agreed to loan this amount to Hannum. However, "Rife should have used the money received from the Bank of Keystone to reduce Citizens' potential liability on the Hannum loan, but Rife deposited the money into Tazewell Farmers Mart account." *Tazewell*, 718 F.Supp. at 473. When the Bank of Keystone called in this

loan, Rife advanced additional funds from Citizens and falsely reported this payment on the bank's debit slips. United States Fidelity & Guaranty Co. (USF & G), who had issued a banker's blanket bond [6] to Citizens, denied any obligation to Citizens under this bond arguing that "Rife's acts were obviously intended to benefit and not to harm Citizens because his acts were designed to decrease the likelihood that Hannum would default." *Id.* at 474. In concluding that Rife had the manifest intent to harm Citizens and to benefit himself or others, the United States District Court for the Western District of Virginia, without defining manifest intent, stated:

> It is necessary to scrutinize Rife's acts and the circumstances surrounding those acts in order to determine Rife's intent. It is rare that a person will admit to an intention to commit a dishonest or fraudulent act. Even in a criminal context, however, it can be inferred that a person intended the natural and probable consequences of his acts.

*Id.* Thus, using this analysis, the District Court found that Rife, as a high ranking officer of Citizens, knew the probable consequences of his acts and thus, had the manifest intent to defraud Citizens.

In *National Bank of Pakistan v. Basham, supra,* a bank officer did not properly debit an account of a bank customer and instead, deliberately debited an account of an unrelated, frozen account. The bank sought reimbursement for the loss caused by the employee under its banker's blanket bond issued by Fireman's Fund Insurance Company. In finding that the bank was entitled to summary judgment as a matter of law, the New York Supreme Court, in a two to one decision, without an analysis of the phrase "manifest intent," found that the attendant result of the employee's actions was to harm the bank. The Court rejected any claim by the insurer that the acts of the employee were merely an error of judgment.

A similar objective test is used in *Hanson PLC v. National Union Fire Insurance Co.,* 58 Wash.App. 561, 794 P.2d 66 (1990). However, rather than a "natural and probable conse-

---

**6.** The bond issued to Citizens by USF & G contained the identical provision at issue in the case herein.

quences" approach, *Hanson* holds that an employee's "manifest intent" must be presumed if a particular result (i.e., harm to bank and benefit to self or others) is *substantially certain* to follow from his or her conduct. *Hanson*, 794 P.2d at 72 (emphasis added). *See also Federal Deposit Ins. Corp. v. United Pacific Insurance Company*, 20 F.3d 1070 (10th Cir. 1994).

A separate line of cases holds that an employee's intent is to be determined from reviewing a broad range of evidence including, but not limited to, the natural and probable consequences of the employee's acts. In the case herein, the trial court relied upon *Federal Deposit Insurance Corporation v. St. Paul Fire and Marine Insurance Company*, 942 F.2d 1032 (6th Cir.1991). In rejecting the FDIC's argument that the only thing to be looked at is the natural and probable consequences of one's actions, the United States Court of Appeals of the Sixth Circuit noted that the natural and probable cause principle had been undermined in recent years, especially in the area of criminal law. *St. Paul Fire and Marine*, 942 F.2d at 1035. The Sixth Circuit Court further added:

> Nonetheless, even in the criminal context, a trier of fact [*may*] make inferences regarding intent based on the natural and probable consequences of actions. It could hardly be otherwise. Intent, as used in ordinary language, is thought to refer to a subjective phenomenon that takes place inside people's heads. In fact, however, the word "intent" is really shorthand for a complicated series of inferences all of which are rooted in tangible manifestations of behavior. For us, the external behavior ordinarily thought to manifest internal mental states is all that matters. We need not concern ourselves with the question of whether mental states actually exist, as an ontological matter. *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990) ("A secret intent is of no consequence."). Although the district court employed the language of "subjective intent" as if it believed that the case turned entirely on inner thoughts, it relied, in its

analysis, on *external indicia of subjective intent*—as it had to.

The FDIC focuses its argument on the term "intent," and it attempts to ignore the word appearing just before "intent"—"manifest." The clause at issue here was introduced in 1976, and has been adopted throughout the fidelity insurance industry. *Hartford Accident and Indem. Ins. Co. v. Washington Nat'l Ins. Co.*, 638 F.Supp. 78, 81 (N.D.Ill. 1986). "Manifest intent," in such a provision, means "apparent or obvious." *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990). Although the concept of "manifest intent" does not necessarily require that the employee actively wish for or desire a particular result, it does require more than a mere probability. See ibid. (manifest intent exists when a particular result is "substantially certain" to follow from conduct).

*St. Paul Fire and Marine*, 942 F.2d at 1035 (emphasis added). It is imperative to note that the *St. Paul Fire and Marine* Court stressed that a blanket banker's bond with manifest intent language covers fraud but not poor or bad business judgment.

As we noted, the trial court in this case relied on *St. Paul Fire and Marine* in reaching its conclusion that Rice did not have the manifest intent to harm the Bank. The court, however, relied in part on Rice's testimony as to what his intent was, and we read *St. Paul Fire and Marine* as not permitting consideration of subjective intent. ("For us, the external behavior ordinarily thought to manifest internal mental states is all that matters." *Id.*

Thus, to determine whether the trial court erred in allowing the testimony of Rice in determining his manifest intent, we must look further. In *First National Bank of Louisville v. Lustig*, 961 F.2d 1162 (5th Cir.1992), the Fifth Circuit Court of Appeals reversed the entry of summary judgment in favor of the First National Bank of Louisville (FNBL) and concluded that whether the bank employee had the manifest intent to

harm FNBL was a question that should go to the jury.[7] In *Lustig*, a bank employee, Kevin DeWitt, misrepresented information on eight construction loans by falsifying credit records of both borrowers and guarantors. In order for FNBL to recover for the losses caused by DeWitt, the bond language, the same language as found in the present case, instructs that FNBL "must prove a loss resulting directly from dishonest or fraudulent acts by a bank employee committed with the manifest intent to cause a loss to the bank and the manifest intent to benefit the employee or someone else." *Lustig*, 961 F.2d at 1165. In reversing the district court, the Fifth Circuit stated that in some instances, the nature of the dishonest or fraudulent act itself may demonstrate whether the employee had the requisite manifest intent. For example, the court stated that acts of embezzlement always cause the bank a loss at the gain of the embezzler. *Id.* at 1165. At the other end of the spectrum, the Fifth Circuit Court recognized that there are circumstances where dishonest acts by employees can only benefit the employee when the bank is also benefited. *See Municipal Securities v. Insurance Co. of N.A.*, 829 F.2d 7 (6th Cir.1987).

In contending that DeWitt's action fell in between these two extremes, the Fifth Circuit instructed:

> To determine intent to cause a loss we do not inquire *solely* into the subjective motive or purpose of the employee. *See St. Paul Fire and Marine*, 942 F.2d at 1035 (courts must rely upon inferences from tangible manifestations of behavior, not merely upon actor's subjective mental state to determine intent). Thus, the claim by an errant employee that no loss to the bank was intended will seldom be conclusive. When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that

---

7. The district court granted summary judgment in favor of FNBL based upon the fact that DeWitt entered a plea of guilty to criminal conduct under 18 U.S.C. § 1005. Even though the plea was subsequently withdrawn, the district court held that, as a matter of law, DeWitt's plea satisfied the language of the bond.

loss. The bank need not produce any direct evidence of the employee's intent, but may rebut an insurer's motion for summary judgment with circumstantial evidence from which a reasonablè jury could infer the intent to cause a loss. *United States v. Adamson*, 700 F.2d 953, 965 (5th Cir.1983) (en banc). (In criminal bank fraud prosecution, trier of fact may infer intent from reckless disregard of bank's interest). The jury should be instructed that in answering the question of intended loss it should consider the range of evidentiary circumstances, including the relationship between the borrowers and the employee, the employee's knowledge of the likelihood that the loans would not be repaid, and all the other surrounding circumstances bearing on the employee's purpose.

*Lustig*, 961 F.2d at 1166 (emphasis added).

█ It is made clear from the decisions of *Lustig* and *St. Paul Fire and Marine* that in reviewing whether an employee had the manifest intent to harm a bank, the court must look at all the surrounding circumstances. The factfinder should look at all the evidence presented, and from this, it *may* infer the employee's manifest intent that stems from actions which evidence knowledge that the losses are substantially certain to result. However, the factfinder must be free to consider all the surrounding facts and circumstances which may possibly aid in determining the actor's intent and may reject such an inference. Only by being able to consider the external indicia of subjective intent, that is, all of the circumstances surrounding the employee's actions, is "manifest" given a meaning in the phrase "manifest intent." To hold that the factfinder may look *only* at the natural and probable consequences of an employee's acts, as was held in *Tazewell* and *Basham*, would lead to the holding of an insurer liable for losses caused to a bank resulting from poor business judgment and improvident decisions. Clearly, this is not the purpose of a banker's blanket bond.

However, we cannot discern from either of these cases whether the factfinder may consider the testimony of the employee as to his intent. As stated, *St. Paul Fire and*

*Marine* seems to reject such testimony as to the employee's intent since "a secret intent is of no consequence." Moreover, the *Lustig* Court posits that "[t]o determine intent to cause a loss we do not inquire *solely* into the subjective motive or purpose of the employee." *Lustig*, 961 F.2d at 1166 (emphasis added). At first glance, it appears that *Lustig* allows the consideration of this evidence and *St. Paul Fire and Marine* does not. However, we stress that *Lustig* refers only to one's intent, not one's manifest intent.

In determining whether the employee's testimony may be considered as evidence of manifest intent, we note the following with approval:

> Looking backwards, all but freak results are the natural consequence of preceding acts. Many are foreseeable. Most employers' losses are the natural and foreseeable consequence of employee acts. But those acts may be negligent. They may be ill-advised or show bad judgment. They may even be reckless. The fact that an injury is the natural result of an act is a causation issue and does not answer the question of whether that injury was manifestly intended by the actor. The point of inquiry is misplaced. The question of manifest intent to cause the employer to suffer a loss must be answered by looking at the point in time when the acts were committed or were contemplated. Was the actor's purpose to cause the loss? Did the actor know that the loss was an inevitable result of his acts? These are the questions that should be asked.

Jane Landes Foster *et al.*, *Does a Criminal Conviction Equal Dishonesty? Criminal Intent Versus Manifest Intent*, 24 Tort & Ins.L.J. 785, 800 (1989).

■ Thus, given the importance of knowing the employee's manifest intent or purpose, we conclude that the factfinder should consider the employee's testimony as to what he intended by his actions, i.e., what was his purpose in engaging in the acts, and was he substantially certain that a particular result would be achieved, together with the external indicia of his subjective intent as defined in *St. Paul Fire and Marine.*

Thus, although on different grounds, we concur with the result reached by the trial court in the case herein.

In its opinion, the trial court concluded that "by changing due dates and granting extensions for less than the one percent fee, Marvin Rice intended to benefit [the Bank] by attempting to save troubled loans." Trial Court Opinion, 6/8/93, at pp. 42–43. It thus follows that the fact that several loans were under-collateralized was the result of poor business judgment. Likewise, the trial court properly considered Rice's testimony that his main goal was to aid loans that were in trouble. In so considering this testimony, the trial court cited *Leucadia, Inc. v. Reliance Insurance Company,* 864 F.2d 964 (2nd Cir.1988). In *Leucadia,* an action was instituted by Leucadia, a factoring and investing business, against Reliance to recover ten million dollars of losses as a result of the alleged fraudulent and dishonest acts of its employee, Edward H. Helmke. Helmke, manager of the mortgage loan department, was involved in three transactions that became the subject of the within mentioned lawsuit. In relation to the "Silverman Transaction," Helmke misrepresented to his superiors the amount of collateral on certain property by an amount close to two million dollars. With regard to the "Duddlesten Transaction," Leucadia contends that Helmke improperly advanced money to the Seamist Corporation, a company controlled by Duddlesten. Thirdly, in the "Suson Transaction," it was discovered that Suson forged the value of several properties in order to obtain loans from Helmke.

In finding that there was insufficient evidence to require Reliance to indemnify Leucadia under the banker's bond, the Second Circuit Court of Appeals considered the following:

In the 1970s, prior to Helmke's becoming head of the mortgage loan department, the real estate market was depressed, and many of Leucadia's loans were in default. In several cases the amount of the loans outstanding exceeded the value of the real estate securing them. Leucadia was repeatedly in upheaval, undergoing four major changes of management in less than fifteen years. Leucadia's losses were therefore due in part to the depressed market condi-

tions, in part to Leucadia's internal disorganization, and in part to the mismanagement of its accounts and its failure properly to supervise its employees.

Furthermore, there is no evidence Helmke intended to benefit himself or others by continuing to advance money to borrowers in arrears.

*Leucadia,* 864 F.2d at 972. The trial court considered such evidence in this case.

■ At this juncture, we note that the Bank and SBI argue that consideration of the Bank's poor managerial structure is the equivalent of considering contributory negligence, and that such consideration is improper given the fact that a contract action is involved. We reject this claim and adopt the reasoning of the trial court in its order denying post-trial motions, which states:

> In using the [*St. Paul Fire and Marine* ] standard it was appropriate, indeed necessary, for the court to examine Rice's actions in the context of the bank's general operations and lending guidelines, or lack thereof. An employee's conduct cannot be judged as dishonest or fraudulent without a basis for comparison with conduct that is deemed proper and expected by the employer. The court cannot determine whether Rice's actions were dishonest or fraudulent within the terms of the fidelity bond without considering proper banking guidelines and procedures with which [the Bank and SBI] claim that Rice failed to comply.

Trial Court Opinion, 2/11/94, at p. 7.

We also add that there is much evidence in the record that shows that Rice merely used poor business judgment in relation to the seventeen tractor trailer loans at issue. On April 23, 1986, when Rice was removed from his job as loan services department manager, Barnhart placed a memorandum in Rice's personnel file attributing the problems in Rice's department to "an apparent management deficiency." *See* National Union's Exhibit 39. Another memorandum, dated August 19, 1986, was placed in Rice's personnel file following a meeting between Rice and other corporate officers of the

Bank. The memorandum reflected that Rice "admitted to bad judgement in his approving loans to finance the full purchase price of truck tractors and trailers." *See* National Union's Exhibit 40. Moreover, on Rice's application for unemployment benefits, it was noted that Rice was dismissed from the Bank "because of mismanagement of department and unsound loan judgements. No evidence of willful misconduct." *See* National Union's Exhibit 46.

Thus, we hold that the "manifest intent" of the employee should be ascertained by deciding his true purpose in causing the loss. In deciding what that purpose was, both direct and circumstantial evidence should be considered, including the employee's own testimony as to his purpose as well as any evidence indicating the employee knew the loss was substantially certain to be the result of his acts.[8]

Order affirmed.

BECK, J., files a concurring opinion.

BECK, Judge, concurring.

I concur in the result. I write separately to address the issue of what quantum of evidence, including both subjective and objective (or external) evidence, is necessary to satisfy the requirement of manifest intent.

An employee may be found to have acted with manifest intent where the loss to the insured was substantially certain to result from the employee's action, whether the employee desired such a result or not. It would be insufficient to show merely that the resultant loss to the insured or the benefit to the employee or others was the probable result of the employee's conduct. Thus, poor judgment alone will not give rise to

---

8. In its brief, National Union argues that section 2(t) of the Bond operates to exclude recovery for interest and the extension fees. Section 2(t) provides:

Section 2. This bond does not cover:
(t) potential income, including, but not limited to, interest and dividends, not realized by the insured

However, because we have affirmed the order of the trial court, we need not reach this issue.

a finding of manifest intent. *See Federal Deposit Ins. Corp. v. United Pacific Ins. Co.,* 20 F.3d 1070, 1077–78 (10th Cir.1994). While direct evidence of the employee's subjective intent, if available, is relevant, all external indicia of intent must also be considered.

*First National Bank of Louisville v. Lustig,* 961 F.2d 1162, 1166 (5th Cir.1992) (citations omitted) instructs:

> To determine intent to cause a loss we do not inquire solely into the subjective motive or purpose of the employee. Thus, the claim by an errant employee that no loss to the bank was intended will seldom be conclusive. When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss. The bank need not produce any direct evidence of the employee's intent, but may rebut an insurer's motion for summary judgment with circumstantial evidence from which a reasonable jury could infer the intent to cause a loss. The jury should be instructed that in answering the question of intended loss it should consider the range of evidentiary circumstances, including the relationship between the borrowers and the employee, the employee's knowledge of the likelihood that the loans would not be repaid, and all the other surrounding circumstances bearing on the employee's purpose.

Mr. Rice did not act with the requisite manifest intent and therefore the bank's alleged losses are not covered by the bond. The record reveals no more than the exercise of poor business judgment by Mr. Rice in his management of the trucking industry loans made by the bank.