**Joan SHOEMAKER, Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY CO., Defendant.**

No. 99–574.

United States District Court,
W.D. Pennsylvania.

Dec. 13, 2001.

Stanley A. Winikoff, Jones, Gregg, Creehan & Gerace, Pittsburgh, PA, Edward G. Shoemaker, Shoemaker & Associates, Pittsburgh, PA, for Joan Shoemaker.

Stanley A. Winikoff, Jeffrey S. Tarker, DeBella & Geer, Pittsburgh, PA, for Lumbermen's Mut. Cas. Co.

Peter J. Taylor, Murphy Taylor, Pittsburgh, PA, for Elderly Citizens Resource Center, Guardianship Services of Allegheny County, Inc., Richard Levine, Monica Maghrak, movants.

*MEMORANDUM OPINION*

CAIAZZA [1], United States Magistrate Judge.

Now before the court are the parties' cross-motions for summary judgment. For the reasons stated below, the Defendant's Motion for Summary Judgment (Doc. 43) will be granted, the Plaintiff's "Motion for Summary Judgment on Count I of [the] Complaint [Breach of Contract]" (Doc. 39) will be denied, and this case will be dismissed with prejudice.

## BACKGROUND

In this diversity action, the Plaintiff presents breach of contract and bad faith claims arising out of an "Employee Dishonesty" Policy ("the Policy") issued by the Defendant Lumbermens Mutual Casualty Co. ("the Defendant," "Lumbermens" or "the Insurer"). A detailed identification of the parties and the factual background in this case were fully set forth in a previously filed Report and Recommendation, adopted by the District Judge then presiding over the action, denying the Defendant's Motion to Dismiss. *See generally* Report and Recommendation dated Sept. 24, 1999 (Doc. 8) at 1–5; *see also generally* Mem. Order dated Nov. 5, 1999 (adopting Report and Recommendation and denying the Defendant's Motion to Dismiss). The court will briefly recapitulate, however, the facts relevant to the instant motions for summary judgment.

This action was brought by Joan Shoemaker ("the Plaintiff"), in her capacity as Administratrix of the Estate of Abbott Ross ("Mr.Ross"), deceased. Before Mr. Ross died, he was adjudicated an incapacitated person, and Patricia Gibbs ("Ms. Gibbs"), an employee of Guardianship Services of Allegheny County, Inc. ("Guardianship Services"), was appointed his "[p]ermanent [g]uardian." *See generally* Compl. at ¶ 7; Def.'s Answer (Doc. 16) at ¶ 7 (admitting same). Shortly after Mr. Ross' death another alleged employee of Guardianship Services, William E. Moore ("Mr.Moore"),[2] applied for and was granted "Letters of Administration" by the Register of Wills for Allegheny County, Pennsylvania regarding Mr. Ross' estate ("the Estate" or "the Ross Estate"). *See generally* Compl. at ¶ 9.

The Plaintiff alleges that, after Mr. Moore was appointed administrator of the Ross Estate, Ms. Gibbs paid him approximately $93,639.22 from Mr. Ross' guardianship estate, which he then deposited in a "PNC Bank Account" in the name of "Estate of Abbott Ross, Deceased, William E. Moore Administrator." *See* Compl. at ¶ 10. The Plaintiff also alleges that, in the months of March and April 1994, Mr. Moore "illegally wrote approximately $60,000.00 in checks from the ... Account to himself" or "Moore's Paralegal Services," an entity Mr. Moore established outside the knowledge of Guardianship Services. *See id.* at ¶¶ 11, 14. In addition, Mr. Moore wrote a check from the account to attorney Richard S. Levine ("Mr.Levine"), the Executive Director of Guardian-

---

1. On March 26, 2001, and upon the consent of the parties, District Judge Donald E. Ziegler referred this case to the undersigned "to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73." *See* Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Order of Reference (Doc. 37).

2. Defense counsel hotly contests the Plaintiff's assertion that Mr. Moore was "an authorized agent and employee of Guardianship Services ...." *Compare id. with* Def.'s Br. in Supp. of Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. (Doc. 44, hereinafter cited as "Def.'s Br.") at 5 (alleging that Mr. Moore was not an "employee" of Guardianship Services). This dispute has no bearing, however, on the court's summary judgment determination.

ship Services, indicating that it was payment for counsel fees. *See id.* at ¶ 14. The Plaintiff asserts that said funds were deposited into Guardianship Services' business bank account, but "there is no evidence that [Mr.] Levine ever personally received or benefitted from" the funds. *See id.* at ¶ 14(a).

In December 1994 the executrix of the estate of Mr. Ross' sister, his sole intestate heir, filed a petition to compel an inventory and accounting of Mr. Ross' Estate. When "[n]either Guardianship Services, [Mr.] Levine [n]or [Mr.] Moore complied with [a state court] Order" granting said motion, "a protracted Orphans' Court litigation ensued . . . ." *See id.* at ¶ 19.

In settlement of that litigation, the Orphans' Court entered a "Consent Decree and Order" on December 9, 1997. *See generally* Orphans' Court Consent Decree and Order (attached as Ex. A to Compl., hereinafter "the Consent Decree" or "the Consent Decree and Order"). The Consent Decree and Order listed "Stipulated Findings," many of which were materially identical to the allegations in the Plaintiff's pleadings here, as summarized *supra*. It also stated, among other things:

- [Mr.] Moore has pled guilty to and is serving a prison term arising out of the following charges: theft by deception and theft by failure to make required deposits of funds in the amount of $60,100.00 from the Estate of [Mr.] Ross.

- By Order of [the Orphans'] Court . . . , [Mr.] Moore has been removed as Administrator of the Estate of [Mr.] Ross,

and Joan Shoemaker, Esq[.,] has been appointed Administratrix.

- The Criminal Division of this Court . . . has entered a Restitution Order [against Mr. Moore and] in favor of the Estate of [Mr.] Ross . . . in the amount of $60,100.00, and has ordered the reduction of the Restitution to Judgment . . . .

- As the result of [Mr.] Moore's misconduct, the loss to the estate of [Mr.] Ross totals at least $71,500.00, of which [Mr.] Moore has actually admitted stealing $60,100.00 . . . . The loss of the estate of $71,500[.00] from August of 1994 to the present, together with interest at the legal rate of —per annum[,] amounts to a total loss of the estate of at least $85,000.00.

*See id.* at ¶¶ 36–40.

Based on the foregoing, it appears undisputed that Mr. Moore stole at least $60,100.00 from the Ross Estate. The question in this case, however, is whether the Defendant Insurer is obligated to provide coverage for the loss under the "Employee Dishonesty" Policy held by Guardianship Services.[3]

Regarding employee dishonesty, the Insurer's policy provided as follows:

We will pay for loss of, and loss from damage to, Covered Property resulting directly from . . . . 'Employee Dishonesty.'

.   .   .   .   .

'Employee Dishonesty' . . . means only dishonest acts committed by an [ ]employee[ ] . . . with the manifest intent to . . . [c]ause [the insured] to sustain

---

**3.** Technically, the Policy was held by Elderly Citizens Research Center, Inc. ("Elderly Citizens"), "a division of Guardianship Services" that acted with it "in a joint and mutual capacity." *See generally* Compl. at ¶¶ 2–3, 6. Nevertheless, Guardianship Services was an "additional named insured[ ] under the policy issued to Elderly Citizens." *See* Def.'s Br. at 9 n.2. There is no apparent dispute, moreover, that the Policy was in effect at the time Mr. Moore appropriated funds from the Ross Estate.

loss[,] and also [to o]btain financial benefits (other than employee benefits earned in the normal course of employment ...) for [t]he [ ]employee[ ] or [a]ny person or organization intended by the [ ]employee[ ] to receive that benefit. *See* "Employee Dishonesty Coverage Form A—Blanket" (attached as Ex. A to Doc. 41) at ¶¶ A, D(3)(a)(1)-(a)(2).

In settling the Orphans' Court proceedings, the parties to that litigation agreed upon, and the court approved, Guardianship Services' assignment of "any and all claims [it] ... ha[d] or might have against Lumbermens ... for loss resulting from the acts of [Mr.] Moore ... relating to or arising out of the Estate of [Mr.] Ross ...." *See* Consent Decree at ¶ 42(b). In exchange for the assignment, along with other consideration,[4] Guardianship Services was "declared to have satisfied and performed any remaining obligations or duties ... [it] may have had with respect to the Estate of [Mr.] Ross ...." *See id.* at ¶ 43.

### THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

The Defendant raises numerous and varied legal theories in support of its Motion for Summary Judgment, including assertions that Mr. Moore was not an "employee" of Guardianship Services under the terms of the Policy, that this lawsuit was untimely filed, that the Plaintiff's claims violate the "no-assignment" provisions of the Policy, and that the Policy does not cover the losses effectuated by Mr. Moore's theft of assets from the Ross Estate. *See generally* Def.'s Br. at 10–34.

On the other hand, the Plaintiff's Motion for Summary Judgment essentially seeks to refute the "defenses proffered by [the Defendant] in support of its refusal [to pay claim(s) ] under the Policy." *See generally* Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. 40, hereinafter cited as "Pl.'s Br.") at 2.

Having reviewed the Defendant's various legal theories, this court concludes that some of them, if accepted, would raise comity concerns in connection with the Orphans' Court's entry of the Consent Decree and Order. *Compare* discussion *supra* (noting Defense counsel's arguments that Mr. Moore was not an employee of Guardianship Services and that the Ross Estate cannot pursue claims assigned to it by Guardianship Services) *with* Consent Decree and Order at ¶ 7 (finding that Moore was an employee of Guardianship Services) *and* at ¶ 42(b) (approving assignment of Guardianship Services' claims under the Policy to the Ross Estate). In addition, the Defendant's timeliness arguments raise thorny issues that would be difficult to resolve on summary judgment. *Cf. generally* Report and Recommendation dated Sept. 24, 1999 at 9–12 (recommending denial of motion to dismiss on timeliness-related grounds).

The court does find merit, however, to Defense counsel's argument that the Plaintiff has failed to show Mr. Moore acted with the *"manifest intent* to ... [c]ause [Guardianship Services] to sustain [a] loss ...."* *See* discussion *supra* at 5 (emphasis added); *see also* Def.'s Br. at 14–19. Even assuming the Plaintiff could survive the other aspects of the Defendant's Motion

---

4. One of the other forms of consideration provided by Guardianship Services was its payment of $11,000.00 to the Ross Estate. *See id.* at ¶ 42(a). Although the Consent Decree does not specify how this amount was calculated, it appears to be an approximation of sums paid by Mr. Moore out of the Ross

Estate and deposited in Guardianship Services' bank account for "counsel" and "administrator's" fees. *See id.* at ¶¶ 34–35; *see also* Compl. at ¶¶ 14–15 (alleging that similar amounts were paid and deposited in Guardianship Services' bank account).

for Summary Judgment, the Plaintiff simply cannot establish that Mr. Moore's conduct met the "manifest intent" language in the Policy. For this reason, the Insurer owed no duty to provide coverage, and the Plaintiff's claims must be dismissed.

### ANALYSIS

This case is before the court on the basis of diversity jurisdiction, and the "task here is limited to deciding the meaning of the term 'manifest intent' as [the undersigned] believe[s] it would have been decided by" the Supreme Court of Pennsylvania. *See generally Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland,* 205 F.3d 615, 643 (3d Cir.2000). Because the Pennsylvania Supreme Court has not spoken on the matter, this court finds highly persuasive the analyses regarding "manifest intent" annunciated by the Third Circuit Court of Appeals ("the Third Circuit Court") in *Resolution Trust* and by the Pennsylvania Superior Court ("the Superior Court") in *Susquehanna Bancshares, Inc. v. National Union Fire Ins. Co. of Pittsburgh,* 442 Pa.Super. 281, 659 A.2d 991 (1995).

Although *Resolution Trust* was not decided under Pennsylvania law, this court finds that the Third Circuit Court's analysis should apply here with equal force. This is so because, even though *Resolution Trust* presented a diversity action that was necessarily resolved under the law of New Jersey, the court surveyed the cases regarding "manifest intent" on a circuit-by-circuit basis, and its specific holding was tied directly to the federal precedent. *See, e.g., id.,* 205 F.3d at 642 ("[w]e agree with the approach espoused by the Courts of Appeals for the Second, Fourth and Fifth Circuits, and hold that the term 'manifest intent' ... requires the insured to prove that the employee engaged in dishonest or fraudulent acts with the specific purpose, object or desire ... to cause a loss").

In addition, the analysis in *Resolution Trust* is largely consistent with the Superior Court's opinion in *Susquehanna,* the only reported decision of the Pennsylvania appellate courts addressing "manifest intent." Indeed, the Superior Court's analysis in *Susquehanna* was cited with approval by the Third Circuit Court in *Resolution Trust. See Resolution Trust,* 205 F.3d at 641 (*citing* and *quoting Susquehanna*'s holding that "the 'manifest intent' of the employee should be ascertained by deciding his true purpose in causing the loss"). For the aforementioned reasons, this court will examine the Plaintiff's claims within the context of the analyses in *Resolution Trust* and *Susquehanna.*

In *Resolution Trust* and *Susquehanna,* the courts were called upon to interpret provisions of fidelity bonds containing employee dishonesty language that was materially identical to the relevant provisions of the Policy here. *Compare Resolution Trust,* 205 F.3d at 636 *and Susquehanna,* 659 A.2d at 992 (quoting identical provisions of fidelity bonds requiring employee to act with "manifest intent" to cause "the [i]nsured to sustain [a] loss") *with* "Employee Dishonesty Coverage Form A— Blanket" at ¶¶ D(3)(a) & (a)(1) (employee must act with "manifest intent to ... [c]ause you to sustain loss") *and* "Crime General Provisions" of Policy (incorporated by reference into Employee Dishonesty Coverage Form and defining "you" as the "Named Insured"). The courts annunciated remarkably similar legal standards governing their analyses and they held, among other things, the following:

- The term "manifest" means that the intent of the employee must be "apparent or obvious," *see Resolution Trust,* 205 F.3d at 637 (citations omitted) *and Susquehanna,* 659 A.2d at 995 (citations omitted).

• As used in the fidelity provision, the term "intent" means "purposefully," *i.e.,* the employee must have acted "with the *specific purpose, object or desire*" to cause the loss to the insured, *see Resolution Trust,* 205 F.3d at 642 (emphasis added) [5] *and Susquehanna,* 659 A.2d at 998 ("we hold that the 'manifest intent' of the employee should be ascertained by deciding *his true purpose* in causing the loss") (emphasis added).

• Although the insured must show that the employee "purposefully" caused its loss, it may do so "with circumstantial evidence from which a reasonable jury could *infer* the [employee's] intent to cause [the insured] a loss," *see Susquehanna,* 659 A.2d at 996 (citation omitted, emphasis added) *and Resolution Trust,* 205 F.3d at 642–43 (insured is permitted "to prove the employee's subjective purpose by introducing objective[, circumstantial] evidence of the employee's intent") (citations omitted).

• Such circumstantial proof may include evidence indicating that the employee acted with "reckless disregard" for a substantial risk of loss to the insured, or had "knowledge of the substantial likelihood" that the insured's loss would result, *see Resolution Trust,* 205 F.3d at 641 (citation and internal quotations omitted) *and Susquehanna,* 659 A.2d at 996–97 (same).

• In considering circumstantial evidence, however, "neither an employee's reck-lessness [n]or his knowledge that a result was substantially certain to occur would satisfy the language of the policy, *absent [an] inference of specific intent*" to cause the insured's loss, *see Resolution Trust,* 205 F.3d at 641–642 *and see also Susquehanna,* 659 A.2d at 997–98.

• In addition, "given the importance of knowing the employee's manifest intent or purpose," the court "should consider the employee's testimony as to what he intended by his actions, *i.e.,* what was his purpose in engaging in the acts, and was he substantially certain that a particular result would be achieved," *see Susquehanna,* 659 A.2d at 997 *and Resolution Trust,* 205 F.3d at 643 (recognizing same) (citation omitted).

In light of these standards, the court now turns to the evidence in this case bearing on whether Mr. Moore "purposefully" caused Guardianship Services a "loss" when he appropriated funds from the Ross Estate.[6] The court clarifies at the onset, however, the standards that apply on summary judgment. While "issues of intent are *generally* unsuited for summary judgment," summary judgment *is appropriate* "if the plaintiff is unable to make an *initial evidentiary showing [regarding] intent,*" and thus identifies no "credibility [issue] for the jury ...." *See Northeast Jet Ctr., Ltd. v. Lehigh–Northampton Airport Auth.,* 1997 WL 230821, *6 (E.D.Pa. May 5, 1997) (emphasis added); *see also, e.g., F.D.I.C. v. National*

---

**5.** In adopting the "purposefully" standard, the Third Circuit Court rejected the lower standard of "knowingly" as less appropriate in light of "the history that prompted [the 'manifest intent' language's] inclusion in the dishonesty definition ...." *See id.; see also id.* at 638 (revision of standard fidelity insurance form in 1976 included "manifest intent" language "to clarify the Surety Association's long-standing intent" to limit coverage to "claims in which the culpable employee acted with the intent or *purpose* to gain a benefit *at*

*the expense of his employer*") (citation and internal quotations omitted, emphasis added).

**6.** Because the Plaintiff–Administratrix brings this suit as the assignee of Guardianship Services' purported causes of action against the Insurer, she "stands in the shoes of the insured." *See generally Banks v. Chiffy,* 1995 WL 701727, *2, 24 Pa. D. & C.4th 340, 343–44 (Pa.Com.Pl. Apr.21, 1995).

*Union Fire Ins. Co. of Pittsburgh, PA,* 146 F.Supp.2d 541, 549 (D.N.J.2001) (holding same and granting summary judgment in favor of insurer because plaintiff "failed to make an initial evidentiary showing of the requisite manifest intent[ ]").

Turning to the facts in this case, Plaintiff's counsel identifies no evidence whatsoever indicating that Mr. Moore stole funds from the Ross Estate with the purpose of causing a loss to Guardianship Services. To the contrary, Mr. Moore has executed an affidavit expressly denying the same. *See* Affid. of W. Moore, attached as Ex. 22 to Def.'s Br. ("The $60,100.00 ... I took from the Estate of Abbott Ross *was not taken with the intent to harm Guardianship Services and/or Elderly Citizens.*") (emphasis added). This denial is consistent, moreover, with an action expressly alleged in the Plaintiff's pleadings, namely that Mr. Moore paid Guardianship Services money out of the Ross Estate's bank account for its "counsel" and "administrator's" fees. *See* Compl. at ¶¶ 34–35.

In addition, the Plaintiff fails to argue that circumstantial evidence indicates Mr. Moore acted with "reckless disregard" for a substantial risk of loss to Guardianship Services, or that he had "knowledge of the substantial likelihood" that a loss would inure to it. Even if counsel had advanced such an argument, this court's review of the record has failed to identify any evidence supporting it.

In light of the standards annunciated in *Susquehanna* and *Resolution Trust,* moreover, Plaintiff's counsel would be more than hard-pressed to meet the relevant standards. As stated in *Susquehanna:*

Looking backwards, all but freak results are the natural consequence of preceding acts. Many are foreseeable. Most

employers' losses are the natural and foreseeable consequence of employee acts.... *The fact that an injury is the natural result of an act is a causation issue* and *does not answer the question of whether that injury was manifestly intended* by the actor. The point of inquiry is misplaced.

*The question of manifest intent* to cause the employer to suffer a loss must be answered by *looking at the point in time when the acts were committed or were contemplated. Was the actor's purpose to cause the loss? Did the actor know that the loss was an inevitable result of his acts?* These are the questions that should be asked.

*See id.,* 659 A.2d at 997 (citation and internal quotations omitted, emphasis added); *cf. also Resolution Trust,* 205 F.3d at 641–642 ("neither an employee's recklessness [n]or his knowledge that a result was substantially certain to occur would satisfy the language of the policy, *absent [an] inference of specific intent*" to cause the insured's loss) (emphasis added).

When "looking at the point in time when [Mr. Moore's] acts were committed," there is no basis for concluding that he intended to cause a loss to anyone other than the Ross Estate. Nor is there any evidence that Mr. Moore stole from the Estate knowing that a loss to Guardianship Services would be an "inevitable result of his act[ions]." Stated differently, even assuming the Plaintiff presented evidence or arguments that Mr. Moore acted with "recklessness" or with "knowledge that a [loss of Guardianship Services] was substantially certain to occur," counsel can show no "inference of specific intent" or purpose to cause Guardianship Services a loss. *See Resolution Trust,* 205 F.3d at 641–42;[7]

---

**7.** The *Susquehanna* Court cited favorably the legal proposition that, "in some instances, *the*

*nature of the dishonest or fraudulent act itself* may demonstrate whether the employee had

*see also, e.g., Lynch Props., Inc. v. Potomac Ins. Co. of Illinois,* 962 F.Supp. 956, 962 (N.D.Tex.1996) (entering summary judgment in favor of insurer where employee embezzled assets of employer-insured's client because "the evidence demonstrate[d] that [the client], rather than [the employer] itself, was [the employee]'s intended victim"); *see also generally Peoples Bank & Trust Co. of Madison County v. Aetna Cas. & Sur. Co.,* 113 F.3d 629, 634 (6th Cir.1997) ("As a practical matter, . . . losses resulting from frauds on third parties will rarely be covered by" fidelity policies containing "manifest intent" language).[8]

Nothing in the Plaintiff's opposition papers defeats the aforementioned conclusions. Counsel's challenges essentially boil down to two: (a) high rhetoric that ignores the relevant legal standards annunciated in *Susquehanna* and *Resolution Trust, see, e.g.,* Pl.'s "Answer" to Def.'s Mot. for Summ. J. (Doc. 45) ("it is completely fanciful for the [Defendant] to allege" that Mr. Moore's conduct fell outside the Policy's coverage, and "this allegation is so contrary to [his] actions that it is an affront to the common-sense of this [c]ourt"); and (b) counsel's assertion that the Ross Estate assets taken by Mr. Moore were in Guardianship Services' "possession." *See, e.g., id.* at ¶ 4.[9]

Regarding counsel's rhetorical musings, the court need only respond that the standards in *Susquehanna* and *Resolution Trust* govern and that the Plaintiff's claims fail under those standards. As to counsel's arguments regarding Guardianship Services' "possession" of the Ross Estate assets, they are neither supported by the record nor persuasive under the law.

Counsel offers no record support for the assertion that Mr. Moore took "monies *in the possession* of [Guardianship Services] . . . for which [that entity] was . . . *legally liable* . . . ." *See generally* Pl.'s Opp'n Br. at ¶ 3 (emphasis added). Aside from being, at least to some degree, conceptually inconsistent with the Plaintiff's "admi[ssion] that . . . [Mr.] Moore pled guilty to charges of theft arising from his embezzlement of *funds from the Estate of Abbott Ross," see id.* at ¶ 4 (emphasis added), counsel's statements are undone by the express allegations of the Complaint. As noted above, at the time Mr. Moore appropriated funds from the Ross Estate,

---

8. In *Peoples Bank,* the court declined to adopt a "categorical holding" that "fraudulent activities toward a third party" can never "be equated with 'manifest intent' to harm the" insured. *See id.* This court too declines to make such a blanket ruling, as it agrees with *Peoples Bank* that coverage could conceivably attach where strong evidence exists that the requisite manifest intent." *See id.,* 659 A.2d at 996 (citation omitted, emphasis added). Although the court does not rest its holding on this proposition, it appears to accurately describe why Mr. Moore's conduct falls outside the Policy's coverage. *See id.; cf. also Resolution Trust,* 205 F.3d at 641 ("if a dishonest act has the *unintended* effect of causing a loss to the employer . . ., the act is not covered by the policy") (citations and internal quotations omitted, emphasis added).

9. Although Plaintiff's counsel asserts that the funds were "in the possession of Elderly Citizens," *see id.,* this court has already explained that that entity was "a division of Guardianship Services" and that the two entities operated "in a joint and mutual capacity." *See* discussion *supra* at 5 n. 3. Thus, the court's references to "Guardianship Services" will, where appropriate, refer to the entities collectively as one.

employee "knew or expected that the loss would migrate to" the insured. *See id.* The Plaintiff here does not present such a case, though, as her counsel identifies no evidence (and makes no argument) that Mr. Moore "harbored such knowledge or expectation," let alone the "short, certain, and obvious" evidence contemplated in *Peoples Bank. See id.*

they were being held in an account under the name of *"Estate of Abbott Ross,* Deceased, *William E. Moore Administrator."* *See* Compl. at ¶ 10 (emphasis added); *see also* discussion *supra* at 3 (highlighting allegations that Mr. Moore "illegally wrote approximately $60,000.00 in checks from" that same account). Nowhere in her pleadings does the Plaintiff allege that Guardianship Services had possession of or control over the account, nor does counsel identify any evidence or law supporting such a conclusion.

Even assuming the Plaintiff made such a showing, the court remains unconvinced that it would have any impact on the "manifest intent" analysis stated above. In other words, even if the Plaintiff could show that the Ross Estate's funds were "property covered" under the Policy, *see* "Crime General Provisions" at ¶ 12, the Plaintiff still must prove that Mr. Moore had the "manifest intent" to cause the insured's loss, a showing she has not made.[10] Thus, the Plaintiff has not defeated the lawfulness of Lumbermens' denial of coverage.

Last, although expressly declining to rest its decision on the matter, the court believes that the equities are sufficiently served under the instant ruling. As referenced above, in settlement of the Orphans' Court litigation Guardianship Services agreed to pay $11,000.00 to the Ross Estate, a sum approximating the amount it received from Mr. Moore as purported payment for "counsel" and "administrator's" fees associated with the Estate. *See* discussion *supra* at 6 n. 4. In addition, a state court has entered judgment in resti-tution against Mr. Moore for $60,100.00, an approximation of the amount the Plaintiff identifies as having been stolen by Mr. Moore from the Ross Estate. *See generally* Compl. at ¶¶ 11, 14. Finally Mr. Moore has sworn, and the Plaintiff has not refuted, that as of the Defendant's filings he was "paying off [said] judgment at a rate of $300.00 per month." *See* Affid. of W. Moore at ¶ 6.

Regardless of whether the Plaintiff agrees that the Ross Estate sufficiently has been made whole, the fact remains that she has not defeated the Defendant's entitlement to summary judgment based on the Policy's "manifest intent" provisions. Thus, an appended Order will grant Lumbermens' Motion for Summary Judgment and dismiss this case with prejudice.

### *ORDER*

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith, IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment (Doc. 43) is GRANTED, the Plaintiffs' "Motion for Summary Judgment on Count I of [the] Complaint" (Doc. 39) is DENIED, and this case IS DISMISSED WITH PREJUDICE.

---

**10.** Paragraph 12 of the "Crime General Provisions," which addresses "Ownership of Property; Interests Covered," states: "The property covered under this insurance is limited to property that [the insured] own[s] or hold[s]," or "[f]or which [it was] legally liable." *See id.,* ¶ 12(a)-(b); *see also* Pl.'s Br. at 20 (citing same provisions in support of summary judgment). The provisions that follow, though, state that the Policy "is for [the insured's] benefit only[, and i]t provides *no rights or benefits to any other person or organization."* *See id.* (emphasis added). In any event, there is no basis for interpreting this "limit[ations]" provision as modifying the "manifest intent" requirement in the Policy.